FROST, DOING BUSINESS UNDER THE NAME OF MITCHELL GIN COMPANY, *v.* CORPORATION COMMISSION OF OKLAHOMA ET AL.

No. 60. Argued November 26, 1928.—Decided February 18, 1929.

516

*Messrs. Robert M. Rainey* and *Streeter B. Flynn,* with whom *Mr. Calvin Jones* was on the brief, for appellant.

*Mr. E. S. Ratliff,* with whom *Messrs. Edwin B. Dabney,* Attorney General of Oklahoma, and *J. D. Holland* were on the brief, for appellees.

Mr. Justice Sutherland delivered the opinion of the Court.

Appellant owns a cotton ginning business in the city of Durant, Oklahoma, which he operates under a permit from the State Corporation Commission. By a statute of Oklahoma, originally passed in 1915 and amended from time to time thereafter, cotton gins are declared to be public utilities and their operation for the purpose of ginning seed cotton to be a public business. Comp. Stats. 1921, § 3712. The commission is empowered to fix their charges and to regulate and control them in other respects. § 3715. No gin can be operated without a license from the commission, and in order to secure such license there must be a satisfactory showing of public necessity. § 3714 as amended by c. 109, Session Laws, 1925. The only substantial amendment to this section made by the act of 1925 is to add the proviso: " provided, that on the presentation of a petition for the establishment of a gin to be run co-operatively, signed by one hundred (100) citizens and tax payers of the community where the gin is to be located, the Corporation Commission shall issue a license for said gin."

By an act of the State Legislature passed in 1917 (Comp. Stats. 1921, § 5599) co-operative agricultural or

horticultural associations not having capital stock or being conducted for profit, may be formed for the purpose of mutual help by persons engaged in agriculture or horticulture. Under a statute passed in 1919 (Comp. Stats. 1921, § 5637, *et seq.*) ten or more persons may form a corporation for the purpose of conducting, among others, an agricultural or horticultural business upon a co-operative plan. A corporation thus formed is authorized to issue capital stock to be sold at not less than its par value. The number of shares which may be held by one person, firm or corporation is limited. Dividends may be declared by the directors at a rate not to exceed eight per cent. per annum. Provision is made for setting aside a surplus or reserve fund; and five per cent. may be set aside for educational purposes. The remainder of the profits of the corporation must be apportioned and paid to its members ratably upon the amounts of the products sold to the corporation by its members and the amounts of the purchases of members from the corporation; but the corporation may adopt by-laws providing for the apportionment of such profits in part to non-members upon the amounts of their purchases and sales from or to the corporation.

The Durant Co-operative Gin Company, one of the appellees, was organized in 1926 under the act of 1919. After its incorporation, the company made an application to the commission for a permit to establish a cotton gin at Durant, accompanying its application with a petition signed by 100 citizens and taxpayers, as required by the statutory proviso above quoted. Appellant protested in writing against the granting of such permit and there was a hearing. The commission, at the hearing, rejected an offer to show that there was no public necessity for the establishment of an additional gin at Durant, and held that the proviso made it mandatory to grant the permit applied for without regard to necessity. Thereupon ap-

pellant brought this suit to enjoin the commission from issuing the permit prayed for and to enjoin the Durant company from the establishment of a cotton gin at Durant, upon the ground that the proviso, as construed and applied by the commission (see *Mont. Bank* v. *Yellowstone County,* 276 U. S. 499, 504), was invalid as contravening the due process and equal protection of the law clauses of the Fourteenth Amendment. The court below, consisting of three judges under § 266 Judicial Code, denied the prayer for an injunction and entered a final decree dismissing the bill. 26 F. (2d) 508.

1. We first consider the preliminary contention made on behalf of appellees that appellant has no property right to be affected by operations of the Durant company and, therefore, no standing to invoke the provisions of the Fourteenth Amendment or to appeal to a court of equity.

It already appears that cotton gins are declared by the Oklahoma statute to be public utilities and their operation for the purpose of ginning seed cotton to be public business. No one can operate a cotton gin for such purpose without securing a permit from the commission. In their regulation and control, the commission is given the same authority which it has in respect of transportation and transmission companies, and the same power to fix rates, charges and regulations. Comp. Stats. 1921, §§ 3712, 3713, 3715. Under § 3714 as amended, *supra* (laying the proviso out of consideration for the moment) the commission may deny a permit for the operation of a gin where there is no public necessity for it, and may authorize a new ginning plant only after a showing is made that such plant is a needed utility. Both parties definitely concede the validity of these provisions, and, for present purposes at least, we accept that view.

It follows that the right to operate a gin and to collect tolls therefor, as provided by the Oklahoma statute, is not

a mere license, but a franchise, granted by the state in consideration of the performance of a public service; and as such it constitutes a property right within the protection of the Fourteenth Amendment. See *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1, 9; *California* v. *Pacific Railroad Co.,* 127 U. S. 1, 40–41; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 328, 329; *Owensboro* v. *Cumberland Telephone Co.,* 230 U. S. 58, 64–66; *Boise Water Co.* v. *Boise City,* 230 U. S. 84, 90–91; *McPhee & McGinnity Co.* v. *Union Pac. R. Co.,* 158 Fed. 5, 10–11.

In *California* v. *Pacific Railroad Co., supra,* pp. 40–41, a franchise is defined as " a right, privilege or power of public concern, which ought not to be exercised by private individuals at their mere will and pleasure, but should be reserved for public control and administration, either by the government directly, or by public agents, acting under such conditions and regulations as the government may impose in the public interest, and for the public security. . . . No private person can establish a public highway, or a public ferry, or railroad, or charge tolls for the use of the same, without authority from the legislature, direct or derived. These are franchises. . . . The list might be continued indefinitely."

Specifically, the foregoing authorities establish that the right to supply gas or water to a municipality and its inhabitants, the right to carry on the business of a telephone system, to operate a railroad, a street railway, city water works or gas works, to build a bridge, operate a ferry, and to collect tolls therefor, are franchises. And these are but illustrations of a more comprehensive list, from which it is difficult, upon any conceivable ground, to exclude a cotton gin, declared by statute to be a public utility engaged in a public business, the operation of which is precluded without a permit from a state governmental agency, and which is subject to the same authority as that exercised over transportation and transmission companies in respect

of rates, charges and regulations.. Under these conditions, to engage in the business is not a matter of common right, but a privilege, the exercise of which, except in virtue of a public grant, would be in derogation of the state's power. Such a privilege, by every legitimate test, is a franchise.

Appellant, having complied with all the provisions of the statute, acquired a right to operate a gin in the city of Durant by valid grant from the state acting through the corporation commission. While the right thus acquired does not preclude the state from making similar valid grants to others, it is, nevertheless, exclusive against any person attempting to operate a gin without obtaining a permit or, what amounts to the same thing, against one who attempts to do so under a void permit; in either of which events the owner may resort to a court of equity to restrain the illegal operation upon the ground that such operation is an injurious invasion of his property rights. 6 Pomeroy's Equity Jurisprudence, 3d ed., (2 Equitable Remedies) §§ 583, 584; *People's Transit Co.* v. *Henshaw,* 20 F. (2d) 87, 90; *Bartlesville El. L. & P. Co.* v. *Bartlesville I. R. Co.,* 26 Okla. 453; *Patterson* v. *Wollmann,* 5 N. D. 608, 611; *Millville Gas Co.* v. *Vineland L. & P. Co.,* 72 N. J. Eq. 305, 307. The injury threatened by such an invasion is the impairment of the owner's business, for which there is no adequate remedy at law.

If the proviso dispensing with a showing of public necessity on the part of the Durant and similar companies is invalid as claimed, the foregoing principles afford a sufficient basis for the maintenance of the present suit, against not only the Durant company, but the members of the commission who threaten to issue a permit for the establishment of a new gin by that company without a showing of public necessity.

2. Is, then, the effect of the proviso to deny appellant the equal protection of the laws within the meaning of the Fourteenth Amendment? As the proviso was construed

and applied by the commission and by the court below, its effect is to relieve all corporations organized under the act of 1919 from an onerous restriction upon the right to engage in a public business which is imposed by the statute upon ˆappellant and other individuals, as well as corporations organized under general law, engaging in such business. That a greater burden thereby is laid upon the latter than upon the former is clear. Immunity to one from a burden imposed upon another is a form of classification and necessarily results in inequality; but not necessarily that inequality forbidden by the Constitution. The inequality thus prohibited is only such as is actually and palpably unreasonable and arbitrary. *Arkansas Gas Co.* v. *Railroad Comm.*, 261 U. S. 379, 384, and cases cited.

The purpose of the clause in respect of equal protection of the laws is to rest the rights of all persons upon the same rule under similar circumstances. *Louisville Gas Co.* v. *Coleman*, 277 U. S. 32, 37. This Court has several times decided that a corporation is as much entitled to the equal protection of the laws as an individual. *Quaker City Cab Co.* v. *Penna.*, 277 U. S. 389, 400; *Kentucky Corp'n* v. *Paramount Exchange*, 262 U. S. 544, 550; *Gulf, Colorado & Santa Fe Ry.* v. *Ellis*, 165 U. S. 150, 154. The converse, of course, is equally true. A classification which is bad because it arbitrarily favors the individual as against the corporation certainly cannot be good when it favors the corporation as against the individual. In either case, the classification, in order to be valid, "'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415; *Air-way Corp.* v. *Day*, 266 U. S. 71, 85; *Schlesinger* v. *Wisconsin*, 270 U. S. 230, 240. That is to say, *mere* difference is not enough: the attempted classification 'must always rest upon some difference which bears a reasonable

and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis.' *Gulf, Colorado & Santa Fe Ry.* v. *Ellis,* 165 U. S. 150, 155." *Louisville Gas Co.* v. *Coleman, supra,* p. 37.

By the terms of the statute here under consideration, appellant, an individual, is forbidden to engage in business unless he can first show a public necessity in the locality for it; while corporations organized under the act of 1919, however numerous, may engage in the same business in the same locality no matter how extensively the public necessity may be exceeded. That the immunity thus granted to the corporation is one which bears injuriously against the individual does not admit of doubt, since by multiplying plants without regard to necessity the effect well may be to deprive him of business which he would otherwise obtain if the substantive provision of the statute were enforced.

It is important to bear in mind that the Durant company was not organized under the act of 1917, but under that of 1919. The former authorizes the formation of an association for mutual help, without capital stock, not conducted for profit, and restricted to the business of its own members, except that it may act as agent to sell farm products and buy farm supplies for a non-member, but as a condition may impose upon him a liability, not exceeding that of a member, for the contracts, debts and engagements of the association, such services to be performed at the actual cost thereof including a pro rata part of the overhead expenses. Comp. Stats. 1921, § 5608. Under this exception, the difference between a non-member and a member is not of such significance or the authority conferred of such scope as to have any material effect upon the general purposes or character of the corporation as a mutual association. As applied to corporations organized under the 1917 act, we have no reason to doubt that the

classification created by the proviso might properly be upheld. *American Sugar Refining Co.* v. *Louisiana,* 179 U. S. 89; *Warehouse Co.* v. *Tobacco Growers,* 276 U. S. 71. A corporation organized under the act of 1919, however, has capital stock, which, up to a certain amount, may be subscribed for by any person, firm or corporation; is allowed to do business for others; to make profits and declare dividends, not exceeding eight per cent. per annum; and to apportion the remainder of its earnings among its members ratably upon the amount of products sold by them to the corporation. Such a corporation is in no sense a mutual association. Like its individual competitor, it does business with the general public for the sole purpose of making money. Its members need not even be cotton growers. They may be—all or any of them—bankers or merchants or capitalists having no interest in the business differing in any respect from that of the members of an ordinary corporation. The differences relied upon to justify the classification are, for that purpose, without substance. The provision for paying a portion of the profits to members or, if so determined, to non-members, based upon the amounts of their sales to or purchases from the corporation, is a device which, without special statutory authority, may be and often is resorted to by ordinary corporations for the purpose of securing business. As a basis for the classification attempted, it lacks both relevancy and substance. Stripped of immaterial distinctions and reduced to its ultimate effect, the proviso, as here construed and applied, baldly creates one rule for a natural person and a different and contrary rule for an artificial person, notwithstanding the fact that both are doing the same business with the general public and to the same end, namely, that of reaping profits. That is to say, it produces a classification which subjects one to the burden of showing a public necessity for his business, from which it relieves the other, and is essentially arbi-

trary, because based upon. no real or substantial differences having reasonable relation to the subject dealt with by the legislation. *Power Co.* v. *Saunders,* 274 U. S. 490, 493; *Louisville Gas Co.* v. *Coleman, supra,* p. 39; *Quaker City Cab Co.* v. *Penna., supra,* p. 402.

3. The further question must be answered: Are the proviso and the substantive provisions which it qualifies separable, so that the latter may stand although the former has fallen? If the answer be in the negative, that is to say, if the parts of the statute be held to be inseparable, the decree below should be affirmed, since, in that event, although the proviso be bad, the inequality created by it would disappear with the fall of the entire statute and no basis for equitable relief would remain. But for reasons now to be stated we are of opinion that the substantive provisions of the statute are severable and may stand independently of the proviso.

If § 3714 *as originally passed* had contained the proviso, the effect would be to render the entire section invalid, because then the result of upholding the substantive part of the section notwithstanding the invalidity of the proviso would have been to make applicable to the Durant company and others similarly organized, the requirement in respect of a showing of public necessity, although the legislative will contemporaneously expressed as part of the same act was to the contrary. In this state of the matter, to hold otherwise would be to extend the scope of the law in that regard so as to embrace corporations which the legislature passing the statute had, by its very terms, expressly excluded, and thus to go in the face of the rule that where the excepting proviso is found unconstitutional the substantive provisions which it qualifies cannot stand. *Davis* v. *Wallace,* 257 U. S. 478, 484. "For all the purposes of construction it [the proviso] is to be regarded as part of the act. The *meaning* of the legislature must be gathered from all they have said, as well from that which

is ineffective for want of power, as from that which is authorized by law." *State ex rel. McNeal.* v. *Dombaugh,* 20 Ohio St. 167, 174–175.

But the proviso here in question was not in the original section. It was added by way of amendment many years after the original section was enacted. If valid, its practical effect would be to repeal by implication the requirement of the existing statute in respect of public necessity insofar as the Durant and similar corporations are concerned. But since the amendment is void for unconstitutionality, it cannot be given that effect, " because an existing statute cannot be recalled or restricted by anything short of a constitutional enactment." *Davis* v. *Wallace, supra,* p. 485.

To this effect also is *Truax* v. *Corrigan,* 257 U. S. 312, 341–342. In that case there had been in force in Arizona, both as a state and a territory, for many years, a general statute granting authority to judges of the courts of first instance to issue writs of injunction. The statute was amended so as to except from its operation certain cases between employers and employees. The amendment was declared invalid as denying the equal protection of the laws; but the general provision of the statute as it originally stood was upheld upon the ground that it had been in force for many years and that an exception in the form of an unconstitutional amendment could not be given the effect of repealing it. And see *Waters-Pierce Oil Company* v. *Texas,* 177 U. S. 28, 47.

Here it is conceded that the statute, before the amendment, was entirely valid. When passed, it expressed the will of the legislature which enacted it. Without an express repeal, a different legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and, therefore, powerless to work any change in.

the existing statute, that statute must stand as the only valid expression of the legislative intent.

In passing upon a similar situation, the Supreme Court of Michigan, speaking through Judge Cooley, in *Campau* v. *Detroit*, 14 Mich. 276, 286, said: " But nothing can come in conflict with a nullity, and nothing is therefore repealed by this act on the ground solely of its being inconsistent with a section of this law which is entirely unconstitutional and void." In *Carr, Auditor,* v. *State ex rel. Coetlosquet*, 127 Ind. 204, 215, the state supreme court disposed of the same point in these words: " We suppose it clear that no law can be changed or repealed by a subsequent act which is void because unconstitutional. . . . An act which violates the Constitution has no power and can, of course, neither build up nor tear down. It can neither create new rights nor destroy existing ones. It is an empty legislative declaration without force or vitality." See also *People* v. *Butler Street Foundry*, 201 Ill. 236, 257–259; *People* v. *Fox*, 294 Ill. 263, 269; *McAllister* v. *Hamlin*, 83 Cal. 361, 365; *State ex rel. Crouse* v. *Mills*, 231 Mo. 493, 498–499; *Ex parte Davis*, 21 Fed. 396, 397. The question is not affected by the fact that the amendment was accomplished by inserting the proviso in the body of the original section and reenacting the whole at length. *Truax* v. *Corrigan, supra; People* v. *Butler Street Foundry, supra,* pp. 258–259; *State ex rel. Crouse* v. *Mills, supra,* p. 499.

4. It is true that appellant applied for and obtained a permit to do business under the statute to which it was sought to attach the proviso in question. Is he, thereby, precluded from assailing the proviso upon the ground that one who claims the benefit of a statute may not assert its invalidity? It is not open to question that one who has acquired rights of property necessarily based upon a statute may not attack that statute as unconstitutional, for he cannot both assail it and rely upon it in the same proceeding. *Hurley*

v. *Commission of Fisheries*, 257 U. S. 223, 225. But here the proviso under attack, having been adopted by a subsequent act and being invalid, had no effect, as we have already said, upon the provisions of the statute. As applied to this case, it began and ended as a futile attempt by the legislature to bring about a change in the law which a previous legislature had enacted. For this purpose, and as construed and applied below, it was a nullity, wholly " without force or vitality," leaving the provisions of the existing statute unchanged. It necessarily results that appellant's rights came into being and owed their continued existence wholly to that statute, disconnected from the ineffective proviso, and it is that statute, so disconnected, which measures the extent to which he may enjoy and defend such rights. In seeking and obtaining the benefits of the statute, appellant proceeded without regard to the proviso, neither affirming nor denying nor in contemplation of law acquiescing in its validity; and his action cannot be made a basis upon which to rest a successful claim of an estoppel *in pais* or of a waiver of the right to maintain the constitutional challenge here made.

We conclude: That the proviso is unconstitutional as contravening the equal protection clause of the Fourteenth Amendment; that the remainder of the statute is separable and affords the sole rule in respect of the questions here to be determined; that the corporation commission is without power to issue permits to corporations organized under the act of 1919 without a showing of public necessity; that the Durant company is without authority to do business in the absence of a permit thus issued; and that appellant is entitled to the relief for which he prays.

*Decree reversed.*

Mr. JUSTICE BRANDEIS, dissenting.

Under § 3714 of Oklahoma Compiled Statutes 1921, as amended by c. 109 of the Laws of 1925, Frost secured

from the Corporation Commission a license to operate a cotton gin in the City of Durant.* Later, the Durant Co-operative Gin Company applied to the Commission under that statute for a license to operate a gin in the same city. In support of its application, it presented a certificate of organization under Chapter 147 of the laws of 1919 entitled "An Act providing for the organization and regulation of cooperative corporations" (Oklahoma Compiled Statutes 1921, Secs. 5637–5652), and a petition signed by one hundred citizens and taxpayers of that community requesting that the license be issued. Frost objected to the granting of a license, on the ground that there was no necessity for an additional gin in that city. The Commission ruled that, upon the showing made, it was obliged by § 3714 as so amended to issue a license, without hearing evidence as to necessity; and indicated its purpose to issue the license. Thereupon, Frost brought this suit under § 266 of the Judicial Code against the Commission, the Attorney General and the Durant Company to enjoin granting the license. A restraining order issued upon the filing of the bill.

The case was first heard by three judges upon application for an interlocutory injunction and upon defendants' motion to dismiss. Frost contended that his license had conferred a franchise; that from it there arose in him the property right to be protected against further local competition, unless existing ginning facilities were inadequate; that in the absence of a showing of necessity com-

---

* The stipulation of facts states: "That W. A. Frost is engaged in the cotton ginning business under the name of Mitchell Gin Company. and owns and operates a cotton gin in the City of Durant, Oklahoma; that said gin is operated under and by virtue of license duly issued by the Corporation Commission of the State of Oklahoma under and by virtue of Article 40, Chapter 7, Compiled Oklahoma Statutes, 1921, as amended by Chapter 191, Session Laws of Oklahoma of 1923 and by Chapter 109 of the Session Laws of Oklahoma of 1925."

petition by the Durant Company would be illegal; and that to issue a license which authorized such competition would take Frost's property without due process of law and deny to him the equal protection of the law. The District Court denied both the injunction and the motion to dismiss; and it dissolved the restraining order. Upon direct appeal by Frost, this Court affirmed the interlocutory decree *per curiam* in *Frost* v. *Corporation Commission*, 274 U. S. 719, on the authority of *Chicago Great Western Ry. Co.* v. *Kendall*, 266 U. S. 94, 100. Thereupon, the facts being stipulated, the case was submitted in the District Court on final hearing to the same judges; and a decree was entered dismissing the bill, 26 F. (2d) 508. This appeal presents the same questions which were argued on the appeal from the interlocutory decree.

Under the Oklahoma Act of 1907 cotton gins were held subject to regulation by the Corporation Commission.[1] In 1915, the Legislature declared them public utilities and restriction of competition was introduced by prohibiting operation of a gin without a license from the Commission. That statute required that a license issue for proper gins already established, but directed that none should issue for a new gin in any community already adequately supplied, except upon " the presentation of a petition signed by not less than fifty farmer petitioners of the immediate vicinity." Session Laws 1915, c. 176 (Oklahoma Compiled Statutes 1921, §§ 3712–3718). Chapter 191 of the Session Laws of 1923 struck out of § 3714 the provision referring to farmers. But in 1925 there was inserted in lieu thereof the proviso " that on the presentation of a petition for the establishment of a gin to be run co-operatively, signed by one hundred (100)

---

[1] Session Laws 1907–08, p. 756 (Comp. Stat. 1921, § 11032). See *Oklahoma Gin Co.* v. *State*, 158 Pac. 629; *Mascho* v. *Chandler Cotton Oil Co.*, 7 Annual Corp. Comm. Report 370. Compare *Harriss-Irby Cotton Co.* v. *State*, 31 Okla. 603.

citizens and taxpayers of the community where the gin is to be located, the Corporation Commission shall issue a license for said gin." Session Laws 1925, c. 109. In 1926, the Supreme Court of Oklahoma held in *Choctaw Cotton Oil Co.* v. *Corporation Commission,* 121 Okla. 51, 52, that a corporation organized under Chapter 147 of the Laws of 1919 was run co-operatively within the meaning of § 3714 as so amended.

The attack upon the statute is rested mainly upon the contention that by requiring issuance of a license to so-called co-operative corporations organized under the law of 1919, the statute as amended in 1925 creates an arbitrary classification. The classification is said to be arbitary, because the differences between such concerns and commercial corporations or individuals engaged in the same business are in this connection not material. The contention rests, I think, upon misapprehensions of fact. The differences are vital; and the classification is a reasonable one. Before stating why I think so, other grounds for affirming the judgment should be mentioned.

*First.* The bill alleges, and the parties have stipulated, that Frost was licensed under § 3714 of the Compiled Statutes as amended by the Act of 1925. The stipulation does not show that prior to the amendment he held any license. His alleged property right to conditional immunity from competition rests wholly on the statute now challenged. It is settled that one cannot in the same proceeding both rely upon a statute and assail it. *Hurley* v. *Commission of Fisheries,* 257 U. S. 223, 225. Compare *Great Falls Mfg. Co.* v. *Atty. General,* 124 U. S. 581, 598–599; *Wall* v. *Parrot Silver & Copper Co.,* 244 U. S. 407, 411–412; *St. Louis Co.* v. *Prendergast Co.,* 260 U. S. 469, 472–473; *Buck* v. *Kuykendall,* 267 U. S. 307, 316; *Booth Fisheries Co.* v. *Industrial Commission,* 271 U. S. 208, 211; *United Fuel Gas Co.* v. *Railroad Commission,* decided January 2, 1929, *ante,* p. 300. This established rule requires affirmance of the judgment below.

*Second.* Frost claims that to grant a license to the Durant Company without a showing of public necessity would involve taking his property without due process. The only property which he asserts would be so taken is the alleged right to be immune from the competition of persons operating without a valid license. But for the statute, he would obviously be subject to competition from anyone. Whether the license issued to him under § 3714 conferred upon him the property right claimed is a question of statutory construction—and thus, ordinarily, a question of state law. "Whether state statutes shall be construed one way or another is a state question, the final decision of which rests with the courts of the State." *Hebert* v. *Louisiana,* 272 U. S. 312, 316. In the absence of a decision of the question by the highest court of the State, this Court would be obliged to construe the statute; and in doing so it might be aided by consideration of the decisions of courts of other States dealing with like statutes. But the Supreme Court of Oklahoma has decided the precise question in *Choctaw Cotton Oil Co.* v. *Corporation Commission,* 121 Okla. 51, 52. It held that a license under § 3714 does not confer the property right claimed, saying: "What property rights are taken from petitioners by licensing another gin, under the foregoing proviso? What rights of any kind could the licensing of another gin affect? It does not disturb the property of petitioners, nor prevent the free operation of their gins. The only right which could be affected by such license is the right of petitioners to operate their gin without competition, a right which is not secured to them either by the state or federal Constitution, hence the contention as to taking their property without due process of law cannot be sustained." As no property right of Frost is invaded—his suit must fail, however objectionable the statute may be.

*Third.* Frost claims that to issue a license to the Durant Company without a showing of necessity would

violate the equality clause. Whether the license was issued to Frost upon a showing of necessity does not appear. The mere granting of a license to the Durant Company later on different, and perhaps easier, terms would not violate Frost's constitutional right to equality, since he has already secured his license under the statute as written. The fact that someone else similarly situated may hereafter be refused a license, and would be thereby discriminated against, is obviously not of legal significance here. *Southern Railway Co.* v. *King*, 217 U. S. 524; *Standard Stock Food Co.* v. *Wright*, 225 U. S. 540; *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571; *Arkadelphia Co.* v. *St. Louis S. W. Ry Co.*, 249 U. S. 134, 149; *Liberty Warehouse Co.* v. *Tobacco Growers*, 276 U. S. 71.

*Fourth.* Frost claims on another ground that his constitutional rights have been violated. He says that what the statute and the Supreme Court of Oklahoma call a license is in law a franchise; that a franchise is a contract; that where a constitutional question is raised this Court must determine for itself what the terms of a contract are; and that this franchise should be construed as conferring the right to the conditional immunity from competition which he claims. None of the cases cited lend support to the contention that the license here issued is a franchise.[2] They hold merely that subordinate political

___

[2] *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1, 9; *California* v. *Pacific Railroad Co.*, 127 U. S. 1, 40–41; *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 328–329; *Owensboro* v. *Cumberland Telephone Co.*, 230 U. S. 58, 64–66; *Boise Water Co.* v. *Boise City*, 230 U. S. 84, 90–91; *McPhee & McGinnity Co.* v. *Union Pac. R. Co.*, 158 Fed. 5, 10–11. *California* v. *Pacific Railroad Co.*, 127 U. S. 1, 40–41, merely describes the types of enterprises which may be made the subject of a franchise. The enterprises mentioned are all of the type which require the use of public property so that the permission of the State is required to condone what would otherwise be a trespass. Further, it is not maintained that the State is restricted to the issuance of franchises for the carrying on of such callings.

bodies, as well as a legislature, may grant franchises; and that violations of franchise rights are remediable, whoever the transgressor. Moreover, the limited immunity from competition claimed as an incident of the license was obviously terminable at any moment. Compare *Louisville Bridge Co.* v. *United States*, 242 U. S. 409. It was within the power of the legislature, at any time after the granting of Frost's license, to abrogate the requirement of a certificate of necessity, thus opening the business to the competition of all comers. It is difficult to see how the lesser enlargement of the possibilities of competition by a license granted under the 1925 proviso could operate as a denial of constitutional rights.

It must also be borne in mind that a franchise to operate a public utility is not like the general right to engage in a lawful business, part of the liberty of the citizen; that it is a special privilege which does not belong to citizens generally; that the State may, in the exercise of its police power, make that a franchise or special privilege which at common law was a business open to all;[3] that a special privilege is conferred by the State upon selected persons; that it is of the essence of a special privilege that the franchise may be granted or withheld at the pleasure of the State; that it may be granted to corporations only, thus excluding all individuals;[4] and that the Federal Constitution imposes no limits upon the State's discretion in this respect.[5] In *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, the plaintiff,

[3] *Noble State Bank* v. *Haskell*, 219 U. S. 104, 112–113.

[4] *Shallenberger* v. *First State Bank*, 219 U. S. 114; *Dillingham* v. *McLaughlin*, 264 U. S. 370. Compare *Assaria State Bank* v. *Dolley*, 219 U. S. 121; *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389, 416.

[5] *Bank of Augusta* v. *Earle*, 13 Pet. 519, 595; *People's Railroad* v. *Memphis Railroad*, 10 Wall. 38, 51; *California* v. *Pacific Railroad Co.*, 127 U. S. 1, 40–41; *Denver* v. *New York Trust Co.*, 229 U. S. 123, 141–142.

claiming an exclusive franchise, sought to enjoin the competition of the defendant. The Court said (p. 659), " ' The right to operate gas-works, and to illuminate a city, is not an ancient or usual occupation of citizens generally. No one has the right to . . . carry on the business of lighting the streets . . . without special authority from the sovereign. It is a franchise belonging to the State, and, in the exercise of the police power, the State could carry on the business itself or select one or several agents to do so.' " The demurrer to the bill was dismissed. In *New Orleans Water-Works Co.* v. *Rivers*, 115 U. S. 674, on similar facts in deciding for the plaintiff, the Court said (p. 682), " The restriction, imposed by the contract upon the use by others than plaintiff of the public streets and ways, for such purposes, is not one of which the appellee can complain. He was not thereby restrained of any freedom or liberty he had before . . ." One who would strike down a statute must show not only that he is affected by it, but that as applied to him, the statute exceeds the power of the State. This rule, acted upon as early as *Austin* v. *The Aldermen*, 7 Wall. 694, and definitely stated in *Supervisors* v. *Stanley,* 105 U. S. 305, 314, has been consistently followed since that time.

*Fifth.* Frost's claim that the Act of 1925 discriminates unjustifiably is not sound. The claim rests wholly on the fact that individuals and ordinary corporations must show inadequacy of existing facilities, while co-operatives organized under the Act of 1919 may secure a license without making such a showing, if the application is supported by a petition of one hundred persons who are citizens and taxpayers in the community. It is settled that to provide specifically for peculiar needs of farmers or producers is a reasonable basis of classification, *American Sugar Refining Co.* v. *Louisiana*, 179 U. S. 89; *Liberty Warehouse Co.* v. *Tobacco Growers*, 276 U. S. 71. And it is conceded that the classification made by the Act of

1925 would be reasonable if it had been limited to co-operatives organized under Chapter 22 of the Laws of 1917. Thus the contention that the classification is arbitrary is directed only to co-operatives organized under the law of 1919. It rests upon two erroneous assumptions: (1) That co-operatives organized under the law of 1919 are substantially unlike those organized under Chapter 22 of the Laws of 1917; and (2) that there are between co-operative corporations under the law of 1919 and commercial corporations no substantial differences having reasonable relation to the subject dealt with by the gin legislation.

The assertion is that co-operatives organized under the law of 1919, being stock companies, do business with the general public for the sole purpose of making money, as do individual or other corporate competitors; whereas co-operatives organized under the law of 1917 are "for mutual help, without capital stock, not conducted for profit, and restricted to the business of their own members." The fact is that these two types of co-operative corporations—the stock and the nonstock—differ from one another only in a few details, which are without significance in this connection; that both are instrumentalities commonly employed to promote and effect co-operation among farmers; that the two serve the same purpose; and that both differ vitally from commercial corporations. The farmers seek through both to secure a more efficient system of production and distribution and a more equitable allocation of benefits. But this is not their only purpose. Besides promoting the financial advantage of the participating farmers, they seek through co-operation to socialize their interests—to require an equitable assumption of responsibilities while assuring an equitable distribution of benefits. Their aim is economic democracy on lines of liberty, equality and fraternity. To accomplish these objectives, both types of co-operative corporations provide for excluding capitalist control. As means to this

end, both provide for restriction of voting privileges, for curtailment of return on capital and for distribution of gains or savings through patronage dividends or equivalent devices.

In order to ensure economic democracy, the Oklahoma Act of 1919 prevents any person from becoming a shareholder without the consent of the board of directors. It limits the amount of stock which one person may hold to $500. And it limits the voting power of a shareholder to one vote. Thus, in the Durant Company, the holder of a single share of the par value of $10 has as much voting power as the holder of 50 shares. The Act further discourages entrance of mere capitalists into the co-operative by provisions which permit five per cent of the profits to be set aside for educational purposes; which require ten per cent of the profits to be set aside as a reserve fund, until such fund shall equal at least fifty per cent of the capital stock; which limit the annual dividends on stock to eight per cent; and which require that the rest of the year's profits be distributed as patronage dividends to members, except so far as the directors may apportion them to non-members.

The provisions for the exclusion of capitalist control of the nonstock type of co-operative organized under the Oklahoma Act of 1917 do not differ materially in character from those in the 1919 Act. The nonstock co-operative also may reject applicants for membership; and no member may have more than one vote. This type of co-operative is called a non-profit organization; but the term is merely one of art, indicating the manner in which the financial advantage is distributed. This type also is organized and conducted for the financial benefit of its members and requires capital with which to conduct its business. In the stock type the capital is obtained by the issue of capital stock, and members are not subjected to personal liability for the corporation's business obliga-

tions. In the nonstock type the capital is obtained partly from membership fees, partly through dues or assessments and partly through loans from members or others. And for fixed capital it substitutes in part personal liability of members for the corporation's obligations.[6] In the stock type there are *eo nomine* dividends on capital and patronage dividends. In the nonstock type the financial benefit is distributed by way of interest on loans and refunds of fees, dues and assessments. And all funds acquired through the co-operative's operations, which are in excess of the amount desirable for a "working fund," are to be distributed as refunds of fees, dues and assesments. Both acts allow business to be done for non-members; and though the nonstock association may, it is not required, to impose obligations on the non-member for the liability of the association. Thus, for the purposes here relevant, there is no essential difference between the two types of co-operatives.

The Oklahoma law of 1919 follows closely in its provisions the legislation enacted earlier in other States with a view to furthering farmers' co-operation. The first emergence of any settled policy as to the means to be employed for effecting co-operation among farmers in the United States came in 1875 when, at the annual convention of the National Grange of the Patrons of Husbandry, recommendations were formally adopted endorsing "Rochdale principles"; and a form of rules for the guidance of prospective organizers was promulgated. These provided for stock companies with shares of $5 each; that no member be allowed to hold more than 100 shares; that ownership

[6] Section 10 makes each member assume "original liability, for his per capita share of all contracts, debts, and engagements of the association existing at the time he becomes a member and created during his membership"; and "additional liability" for his pro rata share of the liability of any other member, whose liability may become uncollectible.

of a single share shall constitute the holder a member of the association; that only 8 per cent "interest" shall be paid on the capital; that the balance of the profits shall go "either to increase the capital or business of the association, or for any educational or provident purposes authorized by the asociation," or be distributed as patronage dividends; and that the patronage dividends be distributed among customers, except that non-members should receive only one-half the proportion of members.[7]

The need of laws framed specifically for incorporating farmers' co-operatives being recognized, Massachusetts enacted in 1866 the necessary legislation by a general law which differed materially from that under which commercial organizations were formed. The statute provided for co-operatives having capital stock.[8] Before 1900, ten other States had enacted laws of like character.[9]   After

---

[7] Nourse, The Legal Status of Agricultural Co-operation (1927), *passim*, particularly pp. 11, 21, 35–36.

[8] Mass. St., 1866, c. 290. The type was called Rochdale because it was this type of organization which the pioneers of the present co-operation among English speaking peoples used there. This law which served as a pattern for most of the co-operative incorporation laws passed by other States prior to 1900 contained fewer of the safeguards to assure preservation of co-operative principles than does the Oklahoma Act of 1919. No limitation was placed on the quantum of stock per member or on the voting privileges; and no restriction was placed on the amount of dividends to be paid on stock, the distribution of profits being left entirely to the by-laws and to the directors, save for the requirement that a portion of the earnings go into a reserve fund.

[9] Pennsylvania, Public Laws 1868, Act 62; Minnesota, Laws 1870, c. 29; Michigan, Acts 1875, No. 75, amending Act 288 of 1865 so as to include agricultural co-operatives; Connecticut, Laws 1875, c. 62; California, Laws 1878, p. 883; New Jersey, Laws 1884, p. 63; Ohio, Laws 1884, p. 54; Kansas, Laws 1887, c. 116; Wisconsin, Laws 1887, c. 126; Montana, 1895, Code (1921), §§ 6375–6385. Tennessee, Laws 1882, c. 8, fails to specify whether the co-operatives to be incorporated thereunder shall be organized with or without capital stock.

1900 many such statutes were passed. Now, only two States lack laws making specific provision for the incorporation of farmers' co-operatives.[10]  Thirty-three States, at least, have enacted laws providing for the formation of co-operative associations of the stock type.  All of them permit a fixed dividend on capital stock, the doing of business for non-members, and the distribution of patronage dividends.[11]  Some of them, recognizing the need for elasticity, impose the single requirement that earnings be apportioned in part on a patronage basis, and leave all other provisions for organization and distribution of profits to the by-laws.[12]

Farmers' co-operative incorporation laws of the non-stock type are of much more recent origin; and are fewer

---

[10] Delaware and Vermont. Vermont, however, has a section in her general corporation law which makes provision for co-operative associations.

[11] Arkansas, Acts 1921, p. 702; California, Laws 1878, p. 883; Colorado, Laws 1913, p. 220; Connecticut, Laws 1875, c. 62; Florida, Acts 1917, c. 7384; Georgia, Acts 1920, p. 125; Illinois, Laws 1915, p. 325; Indiana, Laws 1913, c. 164; Iowa, Code (1924) c. 389, §§ 8459–8485; Kansas, Laws 1913, c. 137; Kentucky, Laws 1918, c. 159; Maryland, Laws 1922, c. 197; Massachusetts, Laws 1920, c. 349; Michigan, Acts 1921, No. 84, c. 4; Minnesota, Mason's Stats. (1927) § 7822–7847; Missouri, Laws 1919, p. 116; Montana, Code (1921), §§ 6375–6396; Nebraska, Comp. Stats. (1922) § 642–648; New Jersey, Laws 1884, p. 63; New York, Laws 1913, c. 454; North Carolina, Laws 1915, c. 144; North Dakota, Laws 1921, c. 43; Oklahoma, Laws 1919, c. 147; Ohio, Laws 1884, p. 54; Oregon, Oregon Laws Supp. (1927), §§ 6954–6976; Pennsylvania, Public Laws, 1887, Act 365; Rhode Island, Laws 1916, c. 1400; South Carolina, Acts, 1915, No. 152; South Dakota, Laws 1913, c. 145; Tennessee, Laws 1917, c. 142; Virginia, Laws 1914, c. 329; Washington, Laws 1913, p. 50; Wisconsin, Laws 1911, c. 368.

[12] See, for example, Nebraska, Laws 1911, c. 32; Indiana, Laws 1913, c. 164; Colorado, Laws 1913, p. 220; North Dakota, Laws 1915, c. 92; Florida, Acts 1917, c. 7384.

in number.[13]   The earliest law of this character was the crude measure enacted in California in 1895.[14]   Statutes of that type have been passed in about sixteen States; [15] but ten of these have also laws of the stock type.[16]   The enactment of state laws for the incorporation of nonstock co-operatives and their extensive use in the co-operative marketing of commodities, are due largely to the fact that, prior to 1922, the Clayton Act, October 15, 1914, c. 323, § 6, (38 Stat. 731), limited to nonstock co-operatives the right to make a class of agreements with members which prior thereto would have been void as in restraint of

[13] Nourse, The Legal Status of Agricultural Co-operation · (1927), pp. 51–72.

[14] Laws 1895, c. 183.   That this Act did not provide satisfactorily for all types of co-operative endeavor is evidenced by the fact that prior to the passage of the Clayton Act (which offered substantial advantages to non-stock corporations) several of California's largest cooperatives did not incorporate under this or the similar act of 1909 (chap. 26), but were organized on a capital stock basis, e. g., California Fruit Growers' Exchange, California raisin growers. See Nourse, The Legal Status of Agricultural Co-operation, p. 64, note.

[15] Nevada, Stat. 1901, c. 60; Michigan, Public Acts 1903, No. 171; Washington, Laws 1907, p. 255; Alabama, Acts 1909, No. 145, p. 168; California, Laws 1909, c. 26; Florida, Laws 1909, c. 5958; Oregon, Laws 1909, c. 190; Idaho, Laws 1913, c. 54; Colorado, Laws 1915, c. 57; New Mexico, Laws 1915, c. 64; Oklahoma, Laws 1917, c. 22; Texas, Laws 1917, c. 193; Louisiana, Acts 1918, No. 98; New York, Laws 1918, c. 655; Pennsylvania, Laws 1919, Act 238; Iowa, Laws 1921, c. 122.   In only two of the States is the doing of business for non-members expressly prohibited.   Iowa, Laws, 1921, c. 122; Texas, Laws 1917, c. 193.   The rest of the statutes, though some are perhaps ambiguous in their terminology, apparently do not impose any restraint in this regard.   See Nourse, The Legal Status of Agricultural Co-operation, p. 62.

[16] Michigan; Washington; California; Florida; Oregon; Colorado; Oklahoma; Pennsylvania; Iowa; New York.   For the citations of these stock type laws see note 9.

trade.[17] See *Liberty Warehouse Co.* v. *Tobacco Growers,* 276 U. S. 71. Nearly one-half of the existing laws of the nonstock type were enacted between 1914 and 1922.[18] This limitation in the Clayton Act proved to be unwise. By the Capper-Volstead Act of February 18, 1922, c. 57, § 1, (42 Stat. 388), Congress recognizing the substantial identity of the two classes of co-operatives, extended the same right to stock co-operatives. The terms of this legislation are significant:

"That persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

---

[17] Nourse, The Legal Status of Agricultural Co-operation (1927), pp. 73-92.

[18] Colorado, Laws 1915, c. 57; New Mexico, Laws 1915, c. 64; Oklahoma, Laws 1917, c. 22; Texas, Laws 1917, c. 193; Louisiana, Acts 1918, No. 98; New York, Laws 1918, c. 655; Pennsylvania, Laws 1919, Act 238; Iowa, Laws 1921, c. 122.

" And in any case to the following:

" Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

Congress recognized the identity of the two classes of co-operatives, and the distinction between agricultural stock co-operative corporations and ordinary business corporations, also, by providing in the Revenue Act of 1926, c. 27, Part III, § 231 (44 Stat. 9), that exemption from the income tax was not to be denied " any such [co-operative] association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, . . . , and if substantially all such stock is owned by producers . . . ; nor shall exemption be denied any such association because there is accumulated and maintained by it a reserve . . . Such an association may market the products of nonmembers in an amount the value of which does not exceed the value of the products marketed for members." This exemption was continued in the Revenue Act of 1928, c. 852, sec. 103 (45 Stat. 812).

More than two-thirds of all farmers' co-operatives in the United States are organized under the stock type laws. In 1925 there were 10,147 reporting organizations. Of these 68.7 per cent were stock associations. In leading States the percentage was larger. In Wisconsin the percentage was 80.0; in North Dakota, 87.0; in Nebraska, 91.3; and in Kansas, 92.0. Of the farmers' co-operatives existing in Oklahoma in 1925, 87.6 per cent were stock associations.[19] The great co-operative systems of Eng-

---

[19] U. S. Dept. of Agriculture, Technical Bulletin No. 40 (1928), Agricultural Co-operative Associations, p. 88. The figures for Oklahoma are obtained from the worksheets from which the table on page 88 was compiled.

land, Scotland and Canada were developed and are now operated by organizations of the stock type.[20]   The non-stock type of co-operative is not adapted to enterprises, which like gins require large investment in plant, and hence considerable fixed capital.[21]   For this reason it was a common practice for marketing co-operatives, which had been organized as nonstock co-operatives in order to comply with the requirements of the Clayton Act above described, to form a subsidiary co-operative corporation with capital stock to carry on the incidental business of warehousing or processing. which requires a large investment in plant.[22]   And the fact that even the marketing of some products may be better served by the stock type of co-operative organizations is so widely recognized that most of the marketing acts provide that associations formed thereunder may organize either with or without capital stock.[23]

[20] See Fay, Co-operation At Home and Abroad (3rd ed. 1925), pp. 279–284, 356, 362–363; Year-Book of Agricultural Co-operation in the British Empire (1927), pp. 131–204; First Annual Report on Co-operative Associations in Canada (1928), pp. 65–78.

[21] The average investment of a plant in Texas is about $40,000. Hathcock, Possible Services of Co-operative Cotton Gins (1928), p. 5.

[22] Nourse, The Legal Status of Agricultural Co-operation, p. 54, note 3.

[23] Alabama, Laws 1921, No. 31, § 2; Arizona, Laws 1921, c. 156, § 2; Arkansas, Acts 1921, No. 116, § 3; California, Laws 1923, c. 103, § 653cc; Colorado, Laws 1923, c. 142, § 3; Florida, Acts 1923, c. 9300, § 3; Georgia, Acts 1921, No. 279, § 2; Idaho, Laws 1921, c. 124, § 3; Illinois, Laws 1923, p. 286, § 3; Indiana, Laws 1925, c. 20, § 3; Kansas, Laws 1921, c. 148, § 3; Louisiana, Acts 1922, No. 57, § 3; Maine, Laws 1923, c. 88, § 3; Minnesota, Laws 1923, c. 264, § 3; Mississippi, Laws 1922, c. 179, § 3; Montana, Laws 1921, c. 233, § 3; New Hampshire, Laws 1925, c. 33, § 2; New Jersey, Laws 1924, c. 12, § 2; New Mexico, Laws 1925, c. 99, § 3; New York, Laws 1924, c. 616, § 3; North Carolina, Laws 1921, c. 87, § 3; North Dakota, Laws 1921, c. 44, § 3; Ohio, Laws 1923, p. 91, § 2; South Carolina, Acts 1921, No. 203, § 3; South Dakota, Laws 1923, c. 15, § 2; Ten-

. Experience has demonstrated, also, that doing business for non-members is usually deemed essential to the success of a co-operative.[24]   More than five-sixths of all the farm-- ers' co-operative associations in the United States do business for non-members.   In 1925, 86.3 per cent of the reporting oganizatiọns did so.   In leading States the percentage was even larger.·   In Wisconsin the percentage was 89.0; in Missouri 93.2; in Minnesota 94.1; in Nebraska 95.8; in Kansas 96.5; in North Dakota 97.0.· In Oklahoma 92 per cent of all co-operatives did business for non-members.[25]   Of the cotton co-operatives in the United States 93.9 per cent did business for non-members.   In Texạs, where co-operative ginning has received successful trial,[26] all the cotton co-operatives perform service for non-

nessee, Laws 1923, c. 100,˙ § 3; Texas, Laws 1921, c. 22, § 3; Utah, Laws ˙1923, c. 6, § 3; Virginia, Laws 1922, c. 48, § 3; Washington, Laws 1921, c. 115, § 2; West Virginia, Acts 1923, c. 53, § 3;·' Wyoming, Laws 1923, c. 83, § 3.

[24] It is ·to· be noted that statutes like the Bingham Cooperative Marketing Act (Acts of Kentucky, 1922, c. 1) which provide solely for the˙formation of ·ṃarketing associations restrict the service of the association (with the exception of storage) to the products of members.   But such statutes do not puṙport· to repeal earlier laws authorizing agricultural cooperation for other purposes which allow business for non-mémbers.   That the legislatures recognize that the problems of cooperative marketing and of other types of agricultural cooperation require different treatment is demonstrated by the retention of general laws providing foı agricultural cooperation after passage of the standard marketing act.   In Oklahoma, for example, in the same year that the Act of 1917 was amended so as to embody some of the features of the Bingham Act, the 1919 Act was amended in unimportant particulars, thus receiving express legislative recognition of its continued usefulness. ˙Laws of Oklahoma, 1923, c. 167, 181.

[25] U. S. Dept. of Agriculture, Technical Bulletin No. 40 (1928),· Agricultural Co-operative Associations, p. 88.   The figures for Oklahoma are obtained from the worksheets from which the table on page˙88 was compiled.˙

[26] Hathcock, Development of Co-operative Gins in Northwest Texas, p. 4.

members. In Oklahoma, also, all of the cotton co-operatives reporting do busines for non-members.[27]

That no one plan of organization is to be labeled as truly co-operative to the exclusion of others was recognized by Congress in connection with co-operative banks and building and loan associations. See *United States* v. *Cambridge Loan & Building Company,* 278 U. S. 55. With the expansion of agricultural co-operation it has been recognized repeatedly. Congress gave its sanction to the stock type of co-operative by the Capper-Volstead Act and also by specifically exempting stock as well as nonstock co-operatives from income taxes. State legislatures recognized the fundamental similarity of the two types of co-operation by unifying their laws so as to have a single statute under which either type of co-operative might organize.[28] And experts in the Department of Agriculture, charged with disseminating information to farmers and legislatures, have warned against any crystallization of the co-operative plan so as to exclude any type of co-operation.[29]

---

[27] U. S. Dept. of Agriculture, Technical Bulletin No. 40 (1928), Agricultural Co-operative Associations, p. 89. The figures for Oklahoma are obtained from the worksheets from which the table on page 89 was compiled.

[28] See e. g., Maryland, Laws 1922, c. 197; New York, Laws 1926, c. 231; Oregon, Supp. 1927, §§ 6954–6976. The New York Law is known as the Co-operatives Corporations Law, and consolidates all prior acts for the formation of co-operative associations. Thus, marketing co-operatives, with or without capital stock, and other agricultural co-operatives, with or without capital stock, and with or without restrictions as to business for non-members, are all organized under the same act.

[29] Chris L. Christensen, chief of the Department of Agriculture's Division of Co-operative Marketing, in Department Circular No. 403 (1926), says (p. 2), " . . . the various forms which co-operative organizations have taken demonstrate the adaptability and extensive usefulness of this form of business organization." And at page 3, "A discussion of organization types is of value only when the condi-

That in Oklahoma a law authorizing incorporation on the stock plan was essential to the development of co-operation among farmers has been demonstrated by the history of the movement in that State. Prior to 1917 there was no statute which specifically authorized the incorporation of co-operatives. In that year the nonstock law above referred to was enacted.[30] Two years passed and only three co-operatives availed themselves of the provisions of that Act. Then persons familiar with the farmers' problems in Oklahoma secured the passage of the law of 1919, providing for the incorporation of co-operatives with capital stock.[31] Within the next five years

tions that make certain types necessary or valuable are taken into consideration. Attempts to build co-operative associations according to any special plan have met with failure in the past, and it is possible that in the future we shall see more rather than fewer types of co-operative organizations."

[30] That the draftsmen of this law were influenced by the restrictions of the Clayton Act is evidenced by the fact that some of the language of § 2 of the 1917 Act is taken *verbatim* from § 6 of the Clayton Act.

[31] The Oklahoma State Market Commission, Carl Williams, editor of the Oklahoma Farmer-Stockman, and various farm organizations lent their assistance to the legislature in drafting this law. See Second Biennial Report of Oklahoma State Market Commission (1919–1920), p. 5; Carl Williams, Letter to Division of Co-operative Marketing, Department of Agriculture, dated January 21, 1929. The Oklahoma State Market Commission says of the 1919 Act (Marketing Bulletin, April 20, 1920, p. 5), "In organizing these new corporations, the farmers had a real basis on which to organize . . . The law was written by men who understood the farmers condition and had some practical knowledge of real cooperative marketing on a business basis. The laws of Minnesota, Nebraska and other states were studied. Conditions under which cooperative associations had failed in the northern states and those which had succeeded were taken into careful consideration. The best points from the laws of the several states, which would be suitable for Oklahoma conditions were incorporated and the features of these laws which were not suitable were eliminated."

202 co-operatives were formed under it; and since then 139 more. In the twelve years since 1917 only 60 non-stock co-operatives have been organized; most of them since 1923, when through an amendatory statute, this type was made to offer special advantages for co-operative marketing.[32] Thus over 82 per cent of all co-operatives in Oklahoma are organized under the 1919 stock act. One hundred and one Oklahoma co-operative cotton gins have been organized under the 1919 stock law; not a single one under the 1917 nonstock law.[33] To deny the co-operative character of the 1919 Act is to deny the co-operative character not only of the gins in Oklahoma which farmers have organized and operated for their mutual benefit, but also that of most other co-operatives within the State, which have been organized under its statutes in harmony with legislation of Congress and pursuant to instructions from the United States Department of Agriculture. A denial of co-operative character to the stock co-operatives is inconsistent also with the history of the movement in other States and countries. For the stock type of co-operative is not only the older form, but is the type more widely used among English speaking peoples.

There remains to be considered other circumstances leading to the passage of the statute here challenged. As was said in *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78, "When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." Here that presumption is reinforced by facts which have been called to our attention. That evils exist in cotton ginning which are subject to drastic legislative regulation

---

[32] Laws 1923, c. 181.

[33] All figures here given are obtained from the files of the Department of Agriculture, Division of Co-operative Marketing.

has recently been recognized by this Court. *Crescent Oil Co.* v. *Mississippi*, 257 U. S. 129. The specific evils existing in Oklahoma which the statute here assailed was enacted to correct was the charging of extortionate prices to the farmer for inferior ginning service and the control secured of the cotton seed.[34] These conditions are partly attributable to the fact that a large percentage of the ordinary commercial gins in Oklahoma are controlled by cotton seed oil mills; which make their service as ginners incidental to that as crushers of seed; and are thereby enabled to secure the seed at less than its value.[35] That

---

[34] Two of the leading farm newspapers in Oklahoma are the Oklahoma Cotton Grower and the Oklahoma Farmer-Stockman, the latter edited by Carl Williams. In an editorial on February 10, 1926, the Cotton Grower urges farmers to form co-operative gins as the only way to obtain economy in ginning service. On March 1, 1927, the Farmer-Stockman contains an editorial urging, as a partial solution of the ginning problem, the placing of members on the Corporation Commission who are interested in the farmer as well as in the commercial gin. On May 15, 1927, the same paper notes the great increase in co-operative ginning in the State, and says that it is due to the extortionate prices charged by private ginners. On August 15, 1927, the Farmer-Stockman speaks of the meeting of the Corporation Commission to fix rates for ginning as the "annual farce." It is stated that the meeting is called a farce because the rate is always set high enough so as to allow grossly excessive returns to the ginners at the expense of the farmers. The editor states that the only solution for the farmer is co-operation in ginning. On September 15, 1927, the same paper states that some privately owned gins have averaged a profit of over 100 per cent on invested capital over a period of three years. On October 15, 1927, the Farmer-Stockman notes that poor ginning can cost the farmer at least four cents on each pound of cotton.

[35] The District Court said (26 F. (2d) 508, 519–520): "The ordinary commercial ginner within the State of Oklahoma may gin either as an individual, a copartnership, or a corporation; no statute, rule, or provision of law restricts him in any wise in the enjoyment of the full proceeds of the earnings under the rate fixed. He usually is engaged, not only in ginning cotton, but also in the purchase of seed

such control of gins may lead to excessive prices for the ginning service was recognized in the *Crescent Oil* case. The fact that, despite the regulatory provisions of the Public Service law, a public utility is permitted to earn huge profits indicates that something more than rate regulation may be needed for the protection of farmers. Certainly, it cannot be said that the legislature could not reasonably believe that co-operative ginning might afford a corrective for rates believed to be extortionate.

Mr. JUSTICE HOLMES and Mr. JUSTICE STONE join in this opinion.

Dissenting opinion of Mr. JUSTICE STONE.

I agree with what Mr. JUSTICE BRANDEIS has said. But there is one aspect of the decision now rendered to which I would especially direct attention. To me it would seem that there are such differences in organization, management, financial structure and practical operation between the business conducted by appellant, a single individual, and that conducted by a corporation organ-

cotton, cotton seed after he has ginned the cotton, and frequently in the purchase of the cotton after it is ginned for profit. A ginner has a greater facility to purchase the seed than anyone else. As he gins the cotton, he catches the seed as they fall from the stand, and has the immediate means for storage and housing same. The patron, if he does not elect to sell to the ginner, must receive them and haul them away; when as a rule he has no place for storage for accumulating as much as a carload, so as to sell them to advantage. A great per cent. of the gins so operated are owned and controlled by cotton seed crushers, operating cotton seed oil mills within the state of Oklahoma; such operation of gins not being entirely for the purpose of rendering a public service, but also for collecting cotton seed at a central point. Their gin business as ginners is incidental to that as crushers of seed, to the end that they may be enabled to purchase the seed under favorable conditions. See *Choctaw Cotton Oil Co.* v. *Corporation Commission,* 121 Okl. 51, 247 P. 390; *Planters' Cotton & Ginning Co.* v. *West,* 82 Okl. 145, 198 P. 855."

ized as is appellee, as to justify the classification and discrimination made by the statute. But, assuming there were no such differences, I fail to perceive any constitutional ground on which appellant can complain of a discrimination from which he has not suffered. His real and only complaint is not that he has been discriminated against either in the grant or enjoyment of his license, but that in the exercise of his non-exclusive privilege of carrying on the cotton ginning business he will suffer from competition by the corporate appellee which, under local law, may secure a like privilege with possibly less difficulty than did appellant.

The proviso of the 1925 Act is held unconstitutional solely on the ground that " an onerous restriction upon the right to engage in a public business " was " imposed by the statute upon appellant " and others similarly situated, which was not imposed on appellee. Appellant, if he had been denied a license, or if his exercise of the privilege, when granted, were more limited by the statute than that of appellee, might invoke the equal protection clause. But he now requires no such protection for he has received his license and is in full and unrestricted enjoyment of the same privilege as that which the appellee seeks. This is not less the case even if the statute be assumed to have made it more difficult for him than for appellee to secure a license.

Whether the grant appellant has received be called a franchise or a license would seem to be unimportant, for in any case it is not an exclusive privilege. Under the Constitution and laws of Oklahoma the legislature has power to amend or repeal the franchise, Constitution of Oklahoma, Art. IX, § 47; *Choctaw Cotton Oil Co.* v. *Corporation Comm.*, 121 Okla. 51, and injury suffered through an indefinite increase in the number of appellant's competitors by non-discriminatory legislation, would clearly be *damnum absque injuria*. A similar in-

crease under the present alleged discriminatory statute would seem likewise to afford appellant no legal cause for complaint, for, a license not having been withheld from him, his position is precisely the same as though the statute authorized the grant of a license to him and to appellee on equal terms. He is suffering, not from any application of the discriminatory feature of the statute, with which alone the Constitution is concerned, see *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, 576; *Arkadelphia Co.* v. *St. Louis Southwestern Ry. Co.*, 249 U. S. 134, 149, but merely from the increase in the number of his competitors, an injury which would similarly have resulted from a non-discriminatory statute granting the privilege to all on terms more lenient than those formerly accorded appellant. Of such a statute, appellant could not complain and I can find no more basis for saying that constitutional rights are impaired where the discrimination which the statute authorizes has no effect, than where the statute itself does not discriminate.

Nor would appellant seem to be placed in any better position to challenge the constitutionality of the statute by recourse to the rule that the possessor of a non-exclusive franchise may enjoin competition unauthorized by the state. Appellee's business is not unauthorized. It is carried on under the sanction of a statute to which appellant himself can offer no constitutional objection, for even unconstitutional statutes may not be treated as though they had never been written. They are not void for all purposes and as to all persons. See *Hatch* v. *Reardon*, 204 U. S. 152, 160. For appellant to say that appellee's permit is void, and that its business may be enjoined, because conceivably someone else may challenge the constitutionality of the Act, would seem to be a departure from the salutary rule consistently applied that only those who suffer from the unconstitutional application of a statute may challenge its validity. See *Roberts & Schaefer Co.* v. *Emmerson*, 271 U. S. 50, 55;

*Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, 544; *Tyler* v. *Judges of Court of Registration,* 179 U. S. 405, 410; *Cusack Co.* v. *Chicago,* 242 U. S. 526, 530; *Standard Stock Food Co.* v. *Wright,* 225 U. S. 540, 550; *Mallinckrodt Chemical Works* v. *Missouri,* 238 U. S. 41, 54; *Darnell* v. *Indiana,* 226 U. S. 390, 398.

It seems to me that a fallacy, productive of unfortunate consequences, lurks in the suggestion that one may maintain a suit to enjoin competition of a business solely because hereafter someone else might suffer from an unconstitutional discrimination and enjoin it. But, more than that, even if the license had been withheld from appellant because he could not support the burden placed upon him by the statute, I should have thought it doubtful whether he would have been entitled to have had appellee's permit cancelled—the relief now granted. He certainly could not have asked more than the very privilege which he now enjoys.

Mr. Justice Holmes and Mr. Justice Brandeis concur in this opinion.