## CHICKASHA COTTON OIL CO. v. COTTON COUNTY GIN CO.

### No. 177.

Circuit Court of Appeals. Tenth Circuit.

April 28, 1930.

Robert M. Rainey, of Oklahoma City, Okl., and Alger Melton, of Chickasha, Okl. (Streeter B. Flynn, of Oklahoma City, Okl., Melton & Melton, of Chickasha, Okl., and Rainey, Flynn, Green & Anderson, of Oklahoma City, Okl., on the brief), for appellant.

J. G. Clift, of Duncan, Okl., and L. M. Gensman, of Lawton, Okl. (Cham Jones and Jones & Clift, all of Duncan, Okl., on the brief), for appellee.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

COTTERAL, Circuit Judge.

The Chickasha Cotton Oil Company, a Delaware corporation, owning and operating a cotton gin at Walters, Okl., appeals from the dismissal of a suit to enjoin the Cotton County Gin Company, chartered under the Oklahoma law, from constructing and operating a gin at the same city.

The grounds of suit as alleged in plaintiff's bill are in substance, and so far as they are material, that it is operating the gin as a needed utility under a license granted by the State Corporation- Commission, pursuant to article 4, chapter 20, Comp. Okl. Stat. 1921, as amended by Chapter 191, Session Laws of 1923; that by section 3712 of that chapter cotton gins are declared to be public utilities and their operation a public business, the commission is thereby authorized to regulate them and fix the rates therefor and enforce its orders, and plaintiff's gin is such utility; that the commission has promulgated its regulations and rates; and that the defendant proposes to establish its gin at Walters, not as a public utility or by virtue of a license, but pursuant to state law, known as Senate Bill No. 16, adopted June 18, 1929 (Laws Okl. Sp. Sess., 1929, c. 240), which impairs the obligation of plaintiff's contract with the state, under section 10, article 1, of the Federal Constitution, and as to plaintiff is violative of the due process and the equal protection clauses of the Fourteenth Amendment. Averments are added that defendant's gin will draw patrons from plaintiff to its irreparable loss and damage, for which it has no adequate remedy at law.

The defendant answered, alleging cotton gins are not public utilities and plaintiff's gin is not such utility, but that cotton ginning is a private business and that the Corporation Commission has no power to regulate gins or fix or enforce charges for their operation, and alleging the state laws in so providing and in requiring a license therefor are invalid, and the defendant invokes the same provisions of the Federal Constitution in its favor, but asserts that if plaintiff has a franchise for cotton ginning, yet defendant proposes to gin cotton solely for its stockholders under and by virtue of Senate Bill No. 16, and it is alleged that statute is valid

and does not violate the constitutional rights of the plaintiff.

At the trial of the cause evidence was introduced by the parties. The District Judge expressed his views in an opinion, holding in substance that the operation of cotton gins is a private business, and the statute in declaring them public utilities is unconstitutional, but if it is not, Senate Bill No. 16 is a valid enactment, because of the provision for ginning the cotton of the defendant's stockholders, requiring a dismissal of the bill.

Article 4, chapter 20, enacted in 1915 (Laws Okl. 1915, c. 176), comprises sections 3712 to 3715, inclusive, of the Compiled Oklahoma Statutes of 1921. Section 3712 declares cotton gins to be public utilities and their operation a public business. Section 3713 forbids the operation of a gin without a license from the State Corporation Commission. By section 3714 the commission is authorized to consider the necessity and demands for a gin at its location, and refuse a license when the ginning facilities of licensed gins at a location are adequate, provided, a license must issue on a petition of not less than fifty farmers, etc. Section 3715 vests in the commission the power to regulate gins with regard to public duties and charges, correst abuses, discrimination and extortion, and prescribe rates and regulations, as in case of transportation and transmission companies. By the Session Laws of 1923, c. 191, sections 3713–3715 were re-enacted and their scope enlarged, but the proviso to section 3714 was omitted. Section 3714 was amended in 1925 (Laws 1925, c. 109), by a proviso, that a license was required on a petition for a gin to be run co-operatively, signed by one hundred citizens and taxpayers of the community. Senate Bill No. 16, adopted in 1929 (Laws Okl., Sp. Sess., 1929, c. 240), amends sections 3712 and 3713, and reads as follows:

"Section 3712. That cotton gins maintained and operated for the purpose of ginning seed cotton of the general public, or of persons other than the person or persons, or the stockholders of the corporation maintaining and operating said gin, or maintained and operated for the purpose of ginning seed cotton not produced and owned by the person or persons, or the stockholders of the corporation, maintaining and operating said gin, are hereby declared to be public utilities, and the operation of same for the purpose of ginning seed cotton is declared to be a public business.

"Section 3713. That no person or persons, or corporation, in this State shall be permitted to maintain and operate a gin for the purpose of ginning seed cotton of the general public, or of ginning seed cotton not produced and owned by the person or persons, or the stockholders of the corporation maintaining and operating said gin, without first having secured a license for such purpose from the State Corporation Commission, said license to be issued upon proper showing to be made as prescribed by the rules and regulations promulgated by the Commission. * * *"

The object of this enactment was to except from classification as public utilities and from the requirement of a license persons and corporations engaged in ginning cotton produced and owned by individuals or stockholders of the corporations. Accordingly, the appellee incorporated under the exceptions. The questions presented are whether cotton gins are public utilities and the foregoing enactment with respect to corporations formed under it violates the constitutional rights of the appellant. It is sufficient to determine whether it denies appellant the equal protection of the laws, under the Fourteenth Amendment.

The character of cotton gins as public utilities has had in its favor the acquiescence of ginners and patrons in the regulations of the State Corporation Commission since 1915. It was assumed to be valid in Sims v. State, 80 Okl. 254, 196 P. 132, 23 A. L. R. 1475, where the rates fixed by the commission on bagging and ties were sustained. In the syllabus, prepared by the court, pursuant to Section 803, C. O. S. 1921, gins are expressly declared to be public utilities. In Planters' Cotton & Ginning Co. v. West Bros., 82 Okl. 145, 198 P. 855, the power of the commission to restrain a discrimination by a gin against cotton buyers was upheld on the same theory. And in Frost v. Corporation Commission, 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483, the parties conceded and the court assumed as a basis of decision the validity of the state laws requiring a license for a gin, and classifying it as a public utility; and it is persuasive the court entertained that view.

It was said in Munn v. Illinois, 94 U. S. 113, at pages 132 and 133, 24 L. Ed. 77: "For our purposes we must assume that, if a state of facts could exist that would justify such legislation, it actually did exist when the statute now under consideration was passed. For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the State. But if it could, we must presume it did. Of

the propriety of legislative interference within the scope of legislative power, the legislature is the exclusive judge."

Looking to the facts on which the power of the state is rested we think it is well sustained. A cotton gin is a necessity to the cotton grower. It is an essential factor in rendering both cotton and seed fit for any practicable use. Concededly, gins are rather numerous in the state, some 1,310 being installed, and two or more are sometimes found at the same place. But the necessity of resorting to a gin renders its operation a matter of public interest. The patronage of a gin is strikingly unlike that of stores for the purchase of food or apparel.

, In Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, 43 S. Ct. 630, 633, 67 L. Ed. 1103, 27 A. L. R. 1280, three classes of public utilities are enumerated. Cotton gins are naturally assigned to the second class, which includes inns, cabs, and grist mills. The fact that grist mills may be operated by water power is a nonessential of its public character. Township of Burlington v. Beasley, 94 U. S. 310, 24 L. Ed. 161. A gin is similar to a grist mill where farmers must have their grain ground to render it suitable for use. The mill prepares the grain for that purpose. The gin separates the cotton from the seed and prepares both for market. But the process whether applied to grain or cotton goes to the availability of the product. And the distinguishing element of both is the necessary service not present in ordinary trade. The public need is apparent of a limitation in the number of local gins, apportioned to the patronage and made effectual by license, and of their regulation as to equipment and operation, and as to rates to prevent exorbitant charges for the service.

Gins also partake largely of the third class, to which warehouses belong, in the respect that the gin owner devotes his business to public use and in effect grants the public an interest in it. While the situation is not the same as in case of a central warehouse at a gate-way of commerce, the need of a gin is no less important to a community. Two extracts from the Wolff Case are apposite:

"The circumstances which clothe a particular kind of business with a public interest, in the sense of Munn v. Illinois and the other cases, must be such as to create a peculiarly close relation between the public and those engaged in it, and raise implications of an affirmative obligation on their part to be reasonable in dealing with the public. * * *

"In nearly all the businesses included under the third head above, the thing which gave the public interest was the indispensable nature of the service and the exorbitant charges and arbitrary control to which the public might be subjected without regulation."

In Tyson & Brother v. Banton, 273 U. S. 418, 438, 47 S. Ct. 426, 431, 71 L. Ed. 718, 58 A. L. R. 1236, the cases were reviewed and held to have turned "upon the existence of conditions, peculiar to the business under consideration, which bore such a substantial and definite relation to the public interest as to justify an indulgence of the legal fiction of a grant by the owner to the public of an interest in the use."

In Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596, the test of a public utility as defined in the Tyson Case was restated and applied.

Our conclusion from the controlling authorities is the business of cotton ginning is a public utility in the state of Oklahoma, and that the state may impose regulations and charges thereon as it has done by its laws.

Appellee's charter recites a purpose to construct, own, and operate gins at Walters and gin cotton produced and owned only by its stockholders, not as a public utility, but pursuant to Senate Bill No. 16. But that act does not require the organization of a mutual or co-operative company, in the true sense, and appellee has not availed itself of the act for that purpose, as is demonstrated by undisputed facts in proof, to which we advert briefly.

The president of the company owns and operates gins at eight or ten points. The capacity of the gin at Walters is 3,000 bales, with stipulated cost of $25,000. The capital stock is the like amount, divided into as many shares. About 60 cotton raisers have subscribed for shares of $1 each, and 150 are needed. By ginning 3,000 bales, expenses could be paid and a profit realized. Cotton is produced in a locality, generally not by farmers, but by lawyers, merchants, and bankers who own the land and rent it to cotton growers. The president of the company has tenants raising 250 acres of cotton. He frankly stated he owned a majority of the stock and "we hope to make a profit." Prior to the regulations adopted under the statute of 1915, there was a condition of poor ginning, inadequate equipment, irregular weights, and other irregularities. These defects have been corrected by a system of inspection and control, through the commission. Gins in Oklahoma are rated as the best

in the South. Freed of upkeep cost and control, ginning companies incorporated under Senate Bill No. 16 would soon be enabled to drive public utilities out of business and destroy the value of their plants.

Actual farmers are the least interested in an enterprise, chartered under the act. Others not producers and owners of cotton may own most of the stock. The president of the appellee proposes to invest his capital in the gin, issue nominal shares to cotton producers and owners and gin their cotton at a price that will yield a profit chiefly to himself. The scheme illustrates the deficiencies of the act. It contains no restriction as to prices and no provision for operation at the net or approximate cost of ginning. It does not provide for an association to gin cotton of the producers and owners for their mutual benefit, and appellee is not of that character. It is designed to allow as a dominant feature a profit to the investor who acquires controlling stock, whether he produces and owns any cotton.

The act in question is therefore accurately classified with the Act of 1919 (sections 5637 et seq., C. O. S. 1921) described in Frost v. Corporation Commission, supra. The immunity from the requirement of a license from a corporation chartered under it for the same reason effects an arbitrary discrimination against appellant. The immunity from regulation as a public utility rests on no different footing and effects a like discrimination. In both respects, the act denies appellant the equal protection of the laws, for which there is no adequate remedy at law.

The decree of the District Court is accordingly reversed, with direction to grant appellant a perpetual injunction against the operation of appellee's gin.

Reversed.

PHILLIPS, Circuit Judge (concurring).

I concur in the result reached in the opinion of Judge COTTERAL, but, on the question of whether a cotton gin is "affected with a public interest," I am not in full accord with all that is said in such opinion.

In Wolff Packing Co. v. Court of Industrial Relations, 262 U. S. 522, at page 535, 43 S. Ct. 630, 632, 67 L. Ed. 1103, 27 A. L. R. 1280, the court divides businesses, said to be "clothed with a public interest," into three classes and defines the second and third classes as follows:

"(2) Certain occupations, regarded as exceptional, the public interest attaching to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or colonial Legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs, and grist mills. State v. Edwards, 86 Me. 102, 29 A. 947, 25 L. R. A. 504, 41 Am. St. Rep. 528; Terminal Taxicab Co. v. [Kutz] District of Columbia, 241 U. S. 252, 254, 36 S. Ct. 583, 60 L. Ed. 984, Ann. Cas. 1916D, 765.

"(3) Businesses which, though not public at their inception, may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly."

Judge COTTERAL holds that cotton ginning falls within both the second and third classes. It is my opinion that it falls only within the third class. It may be analogous to some of the businesses enumerated in the second classification but it is not a business recognized as a public utility by ancient usage and understanding. Analogies have no definite limitations. They are sometimes dangerous. To hold that all businesses, analogous to inns, cabs, and grist mills, are "affected with a public interest," might ultimately lead us far afield.

In Williams v. Standard Oil Co., 278 U. S. 235, 49 S. Ct. 115, 116, 73 L. Ed. 287, 60 A. L. R. 596, the Supreme Court said:

"It is settled by recent decisions of this court that a state Legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.' * * * That phrase * * * has become the established test by which the legislative power to fix prices of commodities, use of property, or services, must be measured. As applied in particular instances, its meaning may be considered both from an affirmative and a negative point of view. Affirmatively, it means that a business or property, in order to be affected with a public interest, must be such or be so employed as to justify the conclusion that it has been devoted to a public use and its use thereby in effect granted to the public. * * * Negatively, it does not mean that a business is

affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect to its maintenance.

In Wolff Packing Co. v. Industrial Court, supra, the Supreme Court further said:

"The expression 'clothed with a public interest,' as applied to a business, means more than that the public welfare is affected by continuity or by the price at which a commodity is sold or a service rendered. The circumstances which clothe a particular kind of business with a public interest, * * * must be such as to create a peculiarly close relation between the public and those engaged in it, and raise implications of an affirmative obligation on their part to be reasonable in dealing with the public. * * *

"In nearly all the businesses included under the third head above, the thing which gave the public interest was the indispensable nature of the service and the exorbitant charges and arbitrary control to which the public might be subjected without regulation."

Are indispensable service and probability of subjection to exorbitant prices therefor inherent characteristics of the business of cotton ginning?

The record discloses the following facts:

Cotton growing is Oklahoma's greatest industry and it is the second largest cotton ginning state in the Union.

Cotton ginning is a manufacturing process; it involves the separation of the seed from the fiber; it is a short but important step in the manufacture of both into useful articles of commerce; it is a process which must take place before either can be marketed.

Cotton farmers, as a class, are not financially independent. An ordinary cotton farmer cannot afford to own and operate his own gin. Because his margin of profit is small, he cannot afford to haul his cotton great distances to have it ginned. He must patronize a cotton gin located within accessible distance to his farm.

In Eastern Oklahoma, the average haul is ten miles and the farmers do not have convenient access to more than one gin. In Western Oklahoma, gins are more numerous and many farmers use automobile trucks to transport their cotton to the gins. The use of trucks enables such farmers to transport their cotton greater distances and gives them access to more than one gin. The gins operate only during a portion of each year.

At the time the 1915 Act was adopted, the gins rendered poor service, had inadequate equipment, had poor scales and gave irregular weights, and the prices charged were more or less uniform.

Since 1915, approximately 1,310 gins have been operated in Oklahoma as public utilities. These have been owned by between 450 and 500 persons. The number of ginning points in Oklahoma, and the number of gins thereat, are as follows: 312 points with 1 gin each, 111 points with 2 gins each, 74 points with 3 gins each, 39 points with 4 gins each, 40 points with 5 gins each, 13 points with 6 gins each, 7 points with 7 gins each, 4 points with 8 gins each, 1 point with 9 gins, 1 point with 11 gins, 1 point with 15 gins and 1 point with 17 gins. Out of 609 cotton ginning points, 312 points have but 1 gin each. While the other points have 2 or more gins each, the gins at each of such points charged uniform prices and gave poor service at the time of the adoption of the 1915 Act.

From the foregoing, it is apparent that, in the average cotton growing community, one gin can render the service for the community and two gins cannot be operated in such community without economic waste; that, when the 1915 law was adopted, a large proportion of the cotton communities had convenient access to only one gin, there was very little competition in price, and there was not sufficient competition in service to bring about the rendition of good ginning with adequate equipment and regular and proper weights.

I think it plainly appears that a cotton gin operator renders an indispensable service and, in the average cotton growing community, enjoys a practical monopoly, and that regulation of prices and service are necessary in order to afford cotton farmers good ginning at fair prices.

It follows then that the business of cotton ginning falls within that class of businesses which render a necessary and indispensable public service, which must enjoy a practical monopoly, absent regulation, in order to operate without economic waste, and which must be regulated in order to protect the patrons against exorbitant prices for poor and inadequate service.

It is my conclusion that, because of these essential characteristics which inhere in the business of cotton ginning in Oklahoma and the peculiar relation it bears to the public, the owners thereof have devoted such business to the public and it has become "affect-

ed with a public interest" and subject to regulation as to character of service to be rendered and price to be charged therefor.

McDERMOTT, Circuit Judge (concurring).

I concur in the decision of this case. My first impression, as to both points involved, was contrary, and I take the liberty of stating the reasons that induced my change of opinion.

The extent of the power to regulate private business is dependent largely upon the evil aimed at. The remedy should have a direct relation to the disease. Dishonest methods, inaccurate weights, unfair discrimination, and many other abuses are subject to legislative correction. Merchants' Exchange v. Missouri, 248 U. S. 365, 39 S. Ct. 114, 63 L. Ed. 300; House v. Mayes, 219 U. S. 270, 31 S. Ct. 234, 55 L. Ed. 213; Brodnax v. Missouri, 219 U. S. 285, 31 S. Ct. 238, 55 L. Ed. 219; McLean v. Arkansas, 211 U. S. 539, 29 S. Ct. 206, 53 L. Ed. 315; Cargill Co. v. Minnesota, 180 U. S. 452, 21 S. Ct. 423, 45 L. Ed. 619. That abuses exist which require and justify some appropriate regulation, does not in itself authorize the state to take over the control of the business. In the Wolff Packing Company Case, 262 U. S. 522, at page 539, 43 S. Ct. 630, 634, 67 L. Ed. 1103, 27 A. L. R. 1280, the court said: "To say that a business is clothed with a public interest is not to determine what regulation may be permissible in view of the private rights of the owner. The extent to which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier. It is not a matter of legislative discretion solely. It depends on the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared. To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner."

The question presented by this record is not whether the state has power to regulate in some respects; the question is, Does it have power to fix the price for the service, and to deny a person the right to enter the ginning business? In the theater ticket case (Tyson v. Banton, 273 U. S. 418 at page 431, 47 S. Ct. 426, 428, 71 L. Ed. 718, 58 A. L. R. 1236) the court said: "The latter power is not only a more definite and serious invasion of the rights of property and the freedom of contract, but its exercise cannot always be justified by circumstances which have been held to justify legislative regulation of the manner in which a business shall be carried on."

For the state to say to one of its citizens that he may not erect a gin on his own land, and gin his neighbor's cotton for a price agreeable to himself and his neighbor, is an heroic remedy, which should only be resorted to in situations where less drastic remedies will not do.

As I see this case, if the power to fix prices is to be sustained, it must be because the business has been devoted to a public use, that is, within the third of the three classes designated by the late Chief Justice in the Wolff Packing Company Case. But even within that class, I feel that we cannot say that the state can take over a business because it is essential to the public, for that would include doctors, tailors, grocerymen, and many other businesses which all concede today to be private; nor is it enough that the business is that of processing, or using property to render service for another, for that would include laundries, wheat threshers, the advertising columns of the newspapers, and many others. Whether there is any one test that can be applied in determining whether a business falls within that third class, I do not know. Ordinarily, at least, I feel that before a business should be so classified, it should appear that it offered to serve all who came, and that it is either a "natural" monopoly, that is, that any competition in such business is economically wasteful, or that there is an absence of both actual and potential competition.

As to whether the situation calls for the drastic remedy of price regulation, the judgment of the legislative body should be final, if reasonable doubt exists about the matter. Adkins v. Children's Hospital, 261 U. S. 525, 544, 43 S. Ct. 394, 67 L. Ed. 785, 24 A. L. R. 1238. At first blush, I could see no reasonable ground for regulating the price of the service of ginning cotton, where competition, actual and potential, was unrestricted. More mature consideration raises a doubt in my mind as to whether, at least in parts of Oklahoma, competition is not more apparent than real; and as to whether the economic situation of the cotton grower was not a serious factor in the problem. The Legislature of Oklahoma which passed this law understood the situation better than I do; I am not apprised of the conditions which confronted the Legislature in 1915. Furthermore, for fifteen years the state has exercised the power without challenge. If this act is an unwarranted invasion of private right, it seems fair

to assume that the validity of the legislation would have been long since challenged. Long public acquiescence should, and does, greatly strengthen the presumption of constitutionality. 12 C. J. 798, and cases there cited. Officials of both the cotton ginners' association and the cotton growers' association indorse the law. Under such circumstances, I have concluded that we should assume that conditions existed which justified the drastic remedy prescribed by the Legislature.

In an opinion written by me in a three-judge case [Owens v. Corporation Commission, 41 F.(2d) ——] I treated the 1929 amendment as valid. The question was not briefed, and was but incidentally in issue; from a reading of the statute, I assumed the intent was to exempt those who ginned their own cotton, either in person or through a corporation. The possibilities of abuse that lurked in the statute did not occur to me. I thought then, and think now, that the Legislature has power to classify genuine co-operative associations or corporations; one who gins his own cotton, or a group of growers who incorporate for the purpose of ginning their cotton, may be fairly and differently classified from those who gin cotton primarily for profit. But the 1929 amendment is not so drawn as to confine the exemption to co-operative enterprises. There are no real limitations in it. The defendant is not a co-operative concern at all; it is a commercial enterprise; on its present plan, when working to capacity, $24,850 of its $25,000 capital will be owned by a commercial ginner, who grows cotton as a side line, or to enable him to gain exemption from the regulation to which other commercial ginners are subject. It is 9/10 of 1 per cent. co-operative, and that is not enough. Because it is not in fact and truth a co-operative concern, and because the amendment permits of such a subterfuge, and for that reason alone, I agree the amendment cannot stand.