**FARMERS' GIN CO. v. HAYES, State Director, Office of Price Administration of Oklahoma.**

**BROWN, Price Administrator of Office of Price Administration, v. FARMERS' GIN CO. et al.**

**Civ. No. 1296.**

District Court, W. D. Oklahoma.

Dec. 28, 1943.

48

Hatcher & Bond, of Chickasha, Okl., for plaintiff.

O. K. Wetzel, of Oklahoma City, Okl., for Office of Price Administration, defendant and intervener.

Melton, McElroy & Vaughn, of Chickasha, Okl., and Snyder & Lybrand and Floyd Green, Gen. Counsel for Corporation Commission, all of Oklahoma City, Okl., for defendants in intervention.

VAUGHT, District Judge.

In the original complaint filed by the Farmers' Gin Company, a corporation, against Rex A. Hayes, State Director, Office of Price Administration for the State of Oklahoma, the plaintiff alleges that it is a corporation organized and existing under and pursuant to the laws of the State of Oklahoma; that it is engaged in the business of ginning cotton for the general public in said state and has its principal place of business at Watonga, Blaine County, Oklahoma, where it operates a cotton gin; that the defendant Hayes is the duly appointed, acting and qualified state director of the Office of Price Administration for the State of Oklahoma, and resides in and has his office and place of business in Oklahoma City, Oklahoma; that he holds his appointment under Prentiss M. Brown, Administrator of the Office of Price Administration, pursuant to Chapter 26, Title II, sec. 201 of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 921; that under the statutes of the State of Oklahoma requiring a showing of public necessity as a condition precedent to the issuance of a permit, the plaintiff is required to comply with the laws of Oklahoma and the rules and regulations of the Corporation Commission of Oklahoma, which it has done and is the holder and owner of certificate of public convenience and necessity No. 1101 dated September 19, 1930, issued by the Corporation Commission of the State of Oklahoma pursuant to law.

That cotton gins are declared by the Oklahoma statutes to be public utilities and their operation for the purpose of ginning seed cotton is declared to be a public business, and that no one is permitted to operate a cotton gin for such purpose without securing a permit from the Corporation Commission; that the Corporation Commission is given the same powers of regulation and control over cotton gins in Oklahoma that it has with respect to transportation and transmission companies, and has the sole and exclusive power to fix

the charges and rates of cotton gins in Oklahoma; that the Corporation Commission may deny the permit to a cotton gin where there is no public necessity for it and may grant a certificate only after a showing is made that such plant is a needed utility; that the right to operate a cotton gin and to collect tolls therefor, as provided by the Oklahoma statutes, is a franchise granted by the state in consideration of the performance of a public service and as such it constitutes a property right within the protection of the Fourteenth Amendment to the Constitution of the United States.

That the production of cotton is one of the chief industries of the State of Oklahoma and is of such paramount importance that the general welfare and prosperity of the state in a very large and real sense depend upon its maintenance; that cotton ginning is a process which must take place before the cotton is in a condition for market; that the individual grower of the raw product is generally financially unable to set up a plant for himself and the service is a necessary one with which, ordinarily, he cannot dispense; that he is compelled to resort for such service to the ginning facilities which operate in his locality; that the relation between the grower of cotton and cotton gins is a peculiarly close one in respect of an industry of vital concern to the general public; and that the business of ginning cotton in Oklahoma has been devoted to a public use since 1915.

The complaint further alleges that the Inflation Control Act of 1942, Chapter 578, sec. 1, 56 Stat. 765, 50 U.S.C.A.Appendix § 961, provides: "* * * That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase." That pursuant to said provision, on July 3, 1943, Horace Hayden, secretary of the Oklahoma Cotton Ginners Association, Inc., of which such association the plaintiff is a member, gave notice pursuant to law to the Transportation and Public Utility Division, Office of Price Administration, Washington, D. C., the agency designated to receive such notice, advising it that the cotton ginners of Oklahoma, acting through their association, would apply to the Corporation Commission for an increase in rates for ginning cotton in the State of Oklahoma for the 1943 season. That on August 16, 1943, after proper notice and the taking of evidence and after an open hearing, in which the Administrator appeared as amicus curiae, the Corporation Commission, pursuant to its authority vested by the Constitution and the laws of Oklahoma, issued its Order No. 16,588, fixing the ginning rates for cotton in Oklahoma for the 1943-1944 ginning season at 32½ cents per cwt. for picked cotton, 35 cents per cwt. for snapped or bollie cotton, and $2 per pattern for bagging and ties; that the Administrator has issued an order, designated Maximum Price Regulation No. 211, fixing the maximum prices or rates for cotton ginning services at 25 cents per cwt. for ginning picked cotton, 27½ cents per cwt. for ginning bollies or snapped cotton, and $1.50 for bagging and ties. That said rates are far below the rates fixed by the Corporation Commission and that the Administrator is attempting to enforce his rates and prevent compliance by the plaintiff with the rates fixed by the Corporation Commission.

The plaintiff asks for injunctive relief against the Administrator and the State Director, enjoining them from enforcing or attempting to enforce Maximum Price Regulation No. 211, as above set out, and for further relief.

A hearing was had on the application for a temporary injunction, at which time it was agreed that no temporary injunction would issue but pending the filing and consideration of the application to intervene on the part of the Administrator, the status quo should be maintained; that the plaintiff in the meantime should charge the rates prescribed by the Corporation Commission, but should keep an accurate account and retain all sums charged in excess of the rates prescribed by the Administrator, to await final determination in this case.

Thereafter, on September 7, 1943, the Administrator was granted permission to file a complaint in intervention, which complaint was duly filed wherein the intervener made additional parties defendant various cotton gins in Oklahoma and the members of the Corporation Commission and the Corporation Commission as a body. The substance of the intervention is that the Administrator had the power, under the Emergency Price Control Act of 1942,

50

supra, to fix rates for ginning cotton in the State of Oklahoma and that the regulation which it issued pursuant to said Act superseded the rates prescribed by the Corporation Commission, and sought a restraining order and a preliminary injunction against all of said defendants, including the Corporation Commission, enjoining them from enforcing, or complying with, the rates prescribed by the Corporation Commission, and prayed that this court convene a three-judge court to hear an application for injunction. 54 F.Supp. 43.

A three-judge court was convened, heard the application, the evidence having been stipulated, and, in a special opinion, held that it was without jurisdiction for the reason that it did not appear that the Administrator sought to enjoin the enforcement of the order of the Corporation Commission on the ground that it was unconstitutional, or issued under a statute that was unconstitutional, but that there was merely a conflict between the order of the Corporation Commission and a federal statute, or a regulation issued pursuant to a federal statute.

At the time of the hearing before the three-judge court, it was stipulated that the evidence be introduced and arguments heard both on the jurisdiction of the three-judge court, and the merits of the case. That in the event it was determined by the three-judge court that it was not a proper case for said court, then the evidence introduced and the arguments heard on the merits be considered by the district court to the same extent as if no three-judge court had been convened and the matter had been set before the district court originally. The opinion rendered by the three-judge court is self-explanatory of the reasons for refusing jurisdiction by that court.

The one issue in this case is whether the order of the Corporation Commission or the regulation issued by the Administrator is controlling.

As stated above, cotton gins have been declared by statute to be public utilities in the State of Oklahoma, since 1915. The Constitution of Oklahoma provides as follows:

Article IX, Sec. 18: "The Commission (Corporation Commission) shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classifications, rules, regulations, and requirements, the Commission may, from time to time, alter or amend. All rates, charges, classifications, rules and regulations adopted, or acted upon, by any such company, inconsistent with those prescribed by the commission, within the scope of its authority, shall be unlawful and void. The commission shall also have the right, at all times, to inspect the books and papers of all transportation and transmission companies doing business in this State, and to require from such companies, from time to time, special reports and statements, under oath, concerning their business; it shall keep itself fully informed of the physical condition of all the railroads of the State, as to the manner in which they are operated, with reference to the security and accommodation of the public, and shall, from time to time, make and enforce such requirements, rules, and regulations as may be necessary to prevent unjust or unreasonable discrimination and extortion by any transportation or transmission company in favor of, or against any person, locality, community, connecting line, or kind of traffic, in the matter of car service, train or boat schedule, efficiency of transportation, transmission, or otherwise, in connection with the public duties of such company."

Article IX, Sec. 19: "* * * The Commission may be vested with such additional powers, and charged with such other duties (not inconsistent with this Constitution) as may be prescribed by law, in connection with the visitation, regulation, or control of corporations, or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges in connection therewith, or with the assessment of the property of corporations, or the appraisement of their franchises, for taxation, or with the investigation of the sub-

ject of taxation generally. Any corporation failing or refusing to obey any valid order or requirement of the Commission, within reasonable time, not less than ten days, as shall be fixed in the order, may be fined by the Commission (proceeding by due process of law as aforesaid) such sum, not exceeding five hundred dollars, as the Commission may deem proper, or such sum, in excess of five hundred dollars, as may be prescribed or authorized by law; and each day's continuance of such failure or refusal, after due service upon such corporation of the order or requirement of the Commission, shall be a separate offense: Provided, That should the operation of such order or requirement be suspended, pending any appeal therefrom, the period of such suspension shall not be computed against the company in the matter of its liability to fines or penalties."

17 Okl.St.Ann. § 41: "Cotton gins maintained and operated for the purpose of ginning seed cotton of the general public, or of persons other than the person or persons, or the stockholders of the corporation maintaining and operating said gin, or maintained and operated for the purpose of ginning seed cotton not produced and owned by the person or persons, or the stockholders of the corporation, maintaining and operating said gin, are hereby declared to be public utilities, and the operation of same for the purpose of ginning seed cotton is declared to be a public business."

17 Okl.St.Ann. § 42: "No person or persons, or corporation, in this State shall be permitted to maintain and operate a gin for the purpose of ginning seed cotton of the general public, or of ginning seed cotton not produced and owned by the person or persons, or the stockholders of the corporation maintaining and operating said gin, without first having secured a license for such purpose from the State Corporation Commission, said license to be issued upon proper showing to be made as prescribed by the rules and regulations promulgated by the Commission. * * *"

17 Okl.St.Ann. § 43: "The Corporation Commission in issuing such license shall have the right to take into consideration the necessity for the operation of a gin for such purpose at the place of its location; provided.nothing herein shall operate to prevent the licensing of gins now established, except for violation of the provisions of this Act or of the rules, regulations, and requirements of the Corporation Commission made and promulgated pursuant to this Act. No new gin plants shall be constructed, installed, or licensed, or any old gin removed from one point to another until satisfactory showing shall have been made to the Corporation Commission setting forth that such gin is a needed utility and that the proposed corporation, company, firm or individual is a competent and desirable corporation, company, firm or individual to establish and operate said gin as may appear in the discretion of said commission; provided, that on the presentation of a petition for the establishment of a gin to be run co-operatively, signed by one hundred (100) citizens and tax payers of the community where the gin is to be located, the Corporation Commission shall issue a license for said gin. The commission shall have the right to take into consideration the responsibility and reliability and qualifications as well as the capacity of the person or persons or corporation to do such ginning business so far as to afford all reasonable facilities, conveniences and services to the public and shall have the power and authority to require such facilities, conveniences and services to be afforded the public. The inspectors provided herein shall be men who have served at least three years in practical and actual gin operation and shall be appointed by the Corporation Commission; that said inspectors shall have the power to make recommendations to the commission as to the opening or closing of any gin or gins as well as to the affording by such gins of the reasonable facilities, conveniences and services to the public hereinbefore authorized to be required, as well as to make such other reports and recommendations to the Corporation Commission as may to said inspectors appear necessary, reasonable and just."

17 Okl.St.Ann. § 44: "The Corporation Commission shall have the same power and authority and be charged with the duty of regulating and controlling such cotton gins in all matters relating to the performance of public duties and the charges therefor and correcting abuses and preventing unjust discrimination and extortion, as is exercised by said Commission as to transportation and transmission companies and shall have the same power to fix rates, rules, charges and regulations to be observed by such person or persons or cor-

poration operating gins and the affording of all reasonable conveniences, facilities and services as it may impose as to transportation or transmission companies. * * *"

17 Okl.St.Ann. § 46: "In all matters pertaining to the regulation and control of gins and ginning and the business of such, the Commission shall have the same power and authority as is now exercised by it under the law as to any matter pertaining to the public visitation, regulation or control of transportation and transmission companies, and may enforce its orders against any person, firm, company, or corporation maintaining or operating a gin or gins, by imposing a fine against them, or either of them, not exceeding $100.00 for the violation of any of its orders."

In Sims v. State, 80 Okl. 254, 196 P. 132, 23 A.L.R. 1475, the Supreme Court of Oklahoma, in passing upon the statute making cotton gins public utilities, held: "* * * that cotton gins within the state of Oklahoma are public utilities, and that the Corporation Commission is vested with jurisdiction to prescribe the price to be charged for bagging and ties furnished to customers by the operators of gins."

In Chickasha Cotton Oil Co. v. Cotton County Gin Co., 40 F.2d 846, 847, 74 A.L.R. 1070, the Circuit Court of Appeals, Tenth Circuit, in recognizing cotton gins as public utilities in Oklahoma, said:

"The character of cotton gins as public utilities has had in its favor the acquiescence of ginners and patrons in the regulations of the State Corporation Commission since 1915. It was assumed to be valid in Sims v. State, 80 Okl. 254, 196 P. 132, 23 A.L.R. 1475, where the rates fixed by the commission on bagging and ties were sustained. In the syllabus, prepared by the court, pursuant to Section 803, C.O.S.1921 [126 S.1941 § 977] gins are expressly declared to be public utilities. In Planters' Cotton & Ginning Co. v. West Bros., 82 Okl. 145, 198 P. 855, the power of the commission to restrain a discrimination by a gin against cotton buyers was upheld on the same theory. And in Frost v. Corporation Commission, 278 U.S. 515, 49 S.Ct. 235, 73 L.Ed. 483, the parties conceded and the court assumed as a basis of decision the validity of the state laws requiring a license for a gin, and classifying it as a public utility; and it is persuasive the court entertained that view.
* * * * *

"Our conclusion from the controlling authorities is the business of cotton ginning is a public utility in the state of Oklahoma, and that the state may impose regulations and charges thereon as it has done by its laws."

In Frost v. Corporation Commission, 278 U.S. 515, 519, 49 S.Ct. 235, 237, 73 L.Ed. 483, the ·Supreme Court of the United States, in recognizing cotton gins in Oklahoma as public utilities, said:

"It already appears that cotton gins are declared by the Oklahoma statute to be public utilities, and their operation for the purpose of ginning seed cotton to be public business. No one can operate a cotton gin for such purpose without securing a permit from the commission. In their regulation and control, the commission is given the same authority which it has in respect of transportation and transmission companies, and the same power to fix rates, charges and regulations. Comp.Stats.1921, §§ 3712, 3713, 3715 [17 O.S.1941 §§ 41, 42, 44.] Under section 3714 as amended, supra [17 O.S. 1941 § 43] (laying the proviso out of consideration for the moment), the commission may deny a permit for the operation of a gin where there is no public necessity for it, and may authorize a new ginning plant only after a showing is made that such plant is a needed utility. Both parties definitely concede the validity of these provisions, and, for present purposes at least, we accept that view.

"It follows that the right to operate a gin and to collect tolls therefor, as provided by the Oklahoma statute, is not a mere license, but a franchise, granted by the state in consideration of the performance of a public service, and as such it constitutes a property right within the protection of the Fourteenth Amendment. See Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 9, 19 S.Ct. 77, 43 L.Ed. 341; State of California v. Southern Pacific Railroad Co., 127 U.S. 1, 40, 41, 8 S. Ct. 1073, 32 L.Ed. 150; Monongahela Navigation Co. v. United States, 148 U.S. 312, 328, 329, 13 S.Ct. 622, 37 L.Ed. 463; [City of] Owensboro v. Cumberland Telephone Co., 230 U.S. 58, 64, 66, 33 S.Ct. 988, 57 L.Ed. 1389; Boise City of Boise Artesian Hot & Cold Water Co., 230 U.S. 84, 90-91, 33 S.Ct. 997, 57 L.Ed. 1400; McPhee & McGinnity Co. v. Union Pac. R. Co. [8 Cir.], 158 F. 5, 10, 11."

In New State Ice Co. v. Liebmann, 285 U.S. 262, 277, 52 S.Ct. 371, 374, 76 L.Ed.

747, the Supreme Court again recognized cotton gins in Oklahoma as public utilities, and distinguished between ginning of cotton and manufacturing of ice. The court said: "We have thus, with some particularity, discussed the circumstances which, so far as the state of Oklahoma is concerned, afford ground for sustaining the legislative pronouncement that the business of operating cotton gins is charged with a public use, in order to put them in contrast with the completely unlike circumstances which attend the business of manufacturing, selling, and distributing ice. Here we are dealing with an ordinary business, not with a paramount industry upon which the prosperity of the entire state in large measure depends. It is a business as essentially private in its nature as the business of the grocer, the dairyman, the butcher, the baker, the shoemaker, or the tailor, each of whom performs a service which, to a greater or less extent, the community is dependent upon and is interested in having maintained; but which bears no such relation to the public as to warrant its inclusion in the category of business charged with a public use. It may be quite true that in Oklahoma ice is not only an article of prime necessity, but indispensable; but certainly not more so than food or clothing or the shelter of a home. And this court has definitely said that the production or sale of food or clothing cannot be subjected to legislative regulation on the basis of a public use; and that the same is true in respect of the business of renting houses and apartments, except as to temporary measures to tide over grave emergencies. See Tyson & Bro.-United Theatre Ticket Offices v. Banton, supra, 273 U. S. pages 437, 438, 47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236, and cases cited."

It will be observed that cotton ginning has been recognized as a public utility in the State of Oklahoma since 1915, that the statute making cotton gins in Oklahoma public utilities has had the approval of the Supreme Court of Oklahoma, of the Tenth Circuit Court of Appeals, and of the Supreme Court of the United States.

The Emergency Price Control Act, supra, under which the administrator bases his authority for making the regulation fixing rates for ginning cotton in Oklahoma, provides in Title III, sec. 302(c), 50 U.S.C.A.Appendix § 942(c): "* * * That nothing in this Act shall be construed to authorize the regulation of (1) compensation paid by an employer to any of his employees, or (2) rates charged by any common carrier or other public utility, * * *."

It will be observed that the Act expressly excludes the application thereof to public utilities. But it is contended by the administrator that public utilities of the character of cotton gins were not contemplated by the Act, and that Congress did not have in mind public utilities such as cotton gins, unless cotton gins had been made such generally throughout the nation.

This case involves the interpretation of the expression "other public utility." It will be observed that in the above quoted section 302(c) of the Act a "common carrier" is specifically named. There was a reason for this. Common carriers are the parents of the family known to the law as "public utilities." Common carriers are now universally accepted as such—so the Act specifically names them. Congress then follows with the expression, "or other public utility." It undoubtedly recognized the fact that many other groups of business had been recognized by state and federal law as public utilities and were governed and regulated by bodies authorized by law for that purpose. It is plain that it was the purpose of the law to regulate prices charged for services to the public authorized by the Act, and to prohibit the administrator from interfering with prices, and regulating the control of services charged to the public by common carriers and other public utilities that are regulated and controlled by other lawful agencies.

In the case of Chas. Wolff Packing Company v. Court of Industrial Relations of the State of Kansas, 262 U.S. 522, 535, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280, Mr. Chief Justice Taft, in defining the character of business which might be recognized as a public utility, used the following pertinent language:

"Businesses said to be clothed with a public interest justifying some public regulation may be divided into three classes:

"(1) Those which are carried on under the authority of a public grant of privileges which either expressly or impliedly imposes the affirmative duty of rendering a public service demanded by any member of the public. Such are the railroads, other common carriers and public utilities.

"(2) Certain occupations, regarded as exceptional, the public interest attaching

to which, recognized from earliest times, has survived the period of arbitrary laws by Parliament or Colonial Legislatures for regulating all trades and callings. Such are those of the keepers of inns, cabs and gristmills. State v. Edwards, 86 Me. 102, 29 A. 947, 25 L.R.A. 504, 41 Am.St.Rep. 528; Terminal Taxicab Co. v. Kutz, 241 U.S. 252, 254, 36 S.Ct. 583, 60 L.Ed. 984, Ann.Cas.1916D, 765.

"(3). Businesses which though not public at their inception may be fairly said to have risen to be such and have become subject in consequence to some government regulation. They have come to hold such a peculiar relation to the public that this is superimposed upon them. In the language of the cases, the owner by devoting his business to the public use, in effect grants the public an interest in that use and subjects himself to public regulation to the extent of that interest although the property continues to belong to its private owner and to be entitled to protection accordingly. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77; Spring Valley Water Works v. Schottler, 110 U.S. 347, 4 S.Ct. 48, 28 L. Ed. 173; People v. Budd, 117 N.Y. 1, 27, 22 N.E. 670, 682, 5 L.R.A. 559, 15 Am.St. Rep. 460; Budd v. People of New York, 143 U.S. 517, 12 S.Ct. 468, 36 L.Ed. 247; Brass v. Stoeser, 153 U.S. 391, 14 S.Ct. 857, 38 L.Ed. 757; Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas. 1912A, 487; German Alliance Insurance Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189; Van Dyke v. Geary, 244 U.S. 39, 47, 37 S.Ct. 483, 61 L.Ed. 973; Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165."

It is manifest that these three characters of business were in contemplation by Congress in the passage of the Act. It was the intent to exclude such groups of business from the Act as had been declared public utilities and were regulated by proper governmental agencies; thus the expression, "other public utility." That such was the intent is made more certain by the provision of the Inflation Control Act of 1942, supra.

This provision was for the purpose of supplementing the Emergency Price Control Act, and to give to the Administrator an opportunity to be heard when public utilities were considering an increase in rates or charges. It cannot be construed in any sense to give the Administrator the authority to regulate such groups of business that have the status of a public utility, but upon the contrary, such groups are specifically excluded from such authority. Thus, the question is not one of the validity or invalidity of the order complained of here, but it is whether or not the order applies to the business of the plaintiff.

In Thorn et al. v. Browne, 257 F. 519, 523, the Circuit Court of Appeals, Eighth Circuit, said: "When a legislative body selects and uses in a statute words or clauses which before the enactment of the law had acquired by judicial interpretation or common consent and use a well-understood meaning and legal effect, the legal presumption is that it intended that they should have that meaning and effect in the statute it enacts." Writ of certiorari was denied, 250 U.S. 645, 39 S.Ct. 494, 63 L.Ed. 1187.

In Hecht et al. v. Malley, 265 U.S. 144, 149, 44 S.Ct. 462, 464, 68 L.Ed. 949, the court said: "To determine rightly the scope and effect of the Revenue Acts now in question it is necessary to bear in mind the previous legislation on the same subject, and the interpretation given it by the decisions of this Court."

In Latimer v. United States, 223 U.S. 501, 504, 32 S.Ct. 242, 56 L.Ed. 526, the court said: "The words, having received such a construction under the act of 1883, must be given the same meaning when used in the tariff act of 1897, on the theory that, in using the phrase in the later statute, Congress adopted the construction already given it by this court. United States v. Baruch, this day decided [223 U.S. page 191, 32 S.Ct. 306, 56 L.Ed. 399]."

It is therefore clear what meaning had been judicially given to public utilities in the state of Oklahoma, as applicable to cotton gins, by the highest court of our nation, and it is therefore presumed that the term public utility was used in the Emergency Price Control Act with the meaning with which it had been clothed by our highest court.

In Davies Warehouse Co. v. Brown, 137 F.2d 201, a decision by the United States Emergency Court of Appeals, a history of the legislation may be found, both in the majority and the dissenting opinions. It is apparent from the discussion in the two opinions that the pur-

pose of Congress, in using the term public utility, was to exclude a regulation which would be made by a public agency authorized by law to fix rates, and there was clearly a purpose to distinguish between rates fixed by a private individual or corporation and rates fixed by public authority. It is presumed that rate-making bodies in the various states contemplate the fixing of a rate which will compensate for the performance of services and at the same time will be fair to all of those who have an interest in the rate.

The Corporation Commission of Oklahoma had a full hearing and in fixing .the rate, evidently attempted to be fair both to the ginner and to the cotton producer. It was certainly not the intention of Congress to interfere with a rate-making body in fixing a rate which it had power, both under its state statute and its state constitution, to make. The language of the Emergency Price Control Act is plain; it is incapable of but one construction. When Congress used the term public utility it knew, or was presumed to know, the application which our highest court had given to public utility as applied to a cotton gin in the State of Oklahoma.

It is the conclusion of this court, therefore, that the act on the part of the Administrator, fixing rates for ginning cotton in the State of Oklahoma, was unauthorized by the Emergency Price Control Act; that the regulation by the Administrator is inapplicable to cotton gins in Oklahoma; and that the act on the part of the Administrator in applying this regulation to cotton ginning in Oklahoma was arbitrary and expressly in conflict with the Act under which the Office of Price Administration was created.

Another question has been raised by the Administrator with reference to the jurisdiction of this court to determine whether or not the regulation is pursuant to, or in conflict with, the Emergency Price Control Act, he insisting that the only court which would have jurisdiction to, determine this question is the Emergency Court of Appeals. The Emergency Court of Appeals, however, was created by the Act, and it was presumed to have power to determine the validity of any regulation made by the Administrator *pursuant* to the *authority* of the *Administrator* to *make such regulation.* But the Act provides that *"nothing in this Act* shall be construed to authorize the regulation of * * * rates charged by any common carrier or other public utility."

This court certainly has jurisdiction to construe federal statutes and it would be inconsistent and slightly immodest for a court created under an act to construe the act which gave the court birth, relative to a matter expressly. excluded from the act in all particulars.

It is readily conceded that the Emergency Court of Appeals would have jurisdiction to determine the validity of a regulation by the Administrator, if the authority to make such regulation can be found in the Act. But if the Act expressly excludes the authority of the Administrator to make such regulation, the effect of such regulation would be the same as if made by a stranger and presents an issue within the jurisdiction of this court.

Judgment will be rendered for the plaintiff and a permanent injunction issued as prayed. The prayer of the intervener will be denied and the action against the Corporation Commission dismissed.

Since the hearing of this case, the resignation of Prentiss M. Brown, as Price Administrator of the Office of Price Administration, and the appointment of Chester Bowles, as his successor, have been suggested. Whereupon, on November 26, 1943, by order of this court, Chester Bowles was substituted in this action as Administrator for and in lieu of Prentiss M. Brown.

A form of judgment, together with findings of fact and conclusions of law, consistent with this opinion may be submitted within fifteen days from this date.