**CINCINNATI (City), Plaintiff, v. KING, Defendant.**

Cincinnati Municipal Court, Hamilton County.

No. 17852.   Decided April 13, 1960.

Lyle W. Castle, Asst. City Solicitor, for plaintiff.
Allen Brown, for defendant.

## OPINION

By KEEFE, J.

On November 27, 1959, a jury found the defendant guilty of violating Section 901 I3 of the Code of Ordinances of the City of Cincinnati. The section is entitled "Indecent Publications," and provides as follows:

"Whoever shall print, engrave, sell, offer for sale, give away, exhibit or publish, or exhibit as for sale or other purpose, or have in his possession or under his control, any obscene, lewd, lascivious, indecent, or immodest book, pamphlet, paper, picture, image, cast statuary, drawing or representation, or any other article of an indecedent or immoral nature, or book, paper, print, circular or writing made up principally of pictures or stories of immodest deeds, lust or crime, or shall exhibit upon the public street or highway, any of the articles or papers, prints, publications, as aforesaid, within the view of passersby upon said street or highway, shall be fined not more than five hundred dollars ($500.00) or imprisoned not more than six (6) months, or both, for the first offense; and shall be fined not more than one thousand dollars ($1,000.00) or imprisoned not more than six (6) months, or both, for the second and subsequent offenses."

Immediately following the return of the verdict, counsel for defendant indicated he would file a motion for a new trial and sentence was not pronounced pending a decision on the motion. The motion for a new trial was filed along with a motion for dismissal of the defendant notwithstanding the adverse verdict of the jury. Oral arguments have been had and this opinion is directed to the two pending motions.

The United States Supreme Court decided the case of Eleazar Smith

v. The People of the State of California (4 L. Ed. [2d] 205), on December 14, 1959, several weeks following the trial of this case. However, in their arguments to this court both the prosecutor and the attorney for the defendant have made extensive references to the Eleazar Smith case and the court must and does consider that case as being controlling, even though the decision followed the trial of this case. When referring to the Eleazar Smith case we are talking about the opinion of the Court delivered by Mr. Justice Brennan and concurred in by himself and five other justices.

In support of his two motions, counsel for David King presents a number of assignments of alleged prejudicial error. The only one which warrants discussion is the contention that the penal ordinance under which this defendant was convicted is unconstitutional as a result of the decision of the United States Supreme Court in the Smith case, which, as I say, was announced publicly about two weeks following the conviction of the defendant in this case.

It is well settled as a general principle of law in Ohio and elsewhere that parties may not take advantage of a situation that does not exist but which, if it did exist, might render a statute or ordinance unconstitutional. **Ohio Natl. Bank of Columbus v. Boone (App) 33 Abs 555,** 35 N. E. (2d) 893, dismissed for want of debatable question in **138 Oh St 629.**

A legislative act is presumed in law to be within the constitutional power of the body making it, whether that body be a municipal or state legislative body. **State, ex rel. Michaels v. Morse (App), 75 Abs 536,** affd **165 Oh St 599, 138 N. E. (2d) 660.**

**O. Jur. 2d,** makes this statement of law:

"Operation on State of Facts Not Involved.—Where, under one state of facts, the operation of a statute is constitutional, a court will not declare it invalid because under another state of facts, **not involved**, its operation would be unconstitutional." Par. 125, Constitutional Law. (Emphasis ours.)

Also from **O. Jur. 2d, par. 157, Constitutional Law:**

"Proof of Operation.—It has been held in passing upon the constitutionality of a statute, a court can be the judge of its operation only through facts of which it can take judicial notice. . . In order to support a claim of unconstitutionality of a statute by reason of its operation the party making the claim must present clear and convincing evidence of a presently existing state of facts which makes the act unconstitutional when applied thereto."

What we are concerned with here is only the state of facts in this particular and specific case, and not in the conjectural operation of Cincinnati's "Indecent Publications" ordinance in a hypothetical trial. The question to be answered is solely whether in the judgment of the trial court the defendant received a fair trial free from any prejudicial error, including the operation of Cincinnati's ordinance, in the present and existing factual situation. Both motions are addressed to the sound discretion of this court and it is axiomatic that an appellate court will not reverse unless there is an abuse of that discretion, and unless it appears that the matter asserted as a ground for a new trial, and

dismissal, was a matter affecting materially the substantial rights of the defendant in this case. **Criminal Law, 16 O. Jur 2d 652.**

So far as we are concerned here, the Smith case stands for the legal proposition that a bookseller, such as the defendant in the Cincinnati case, must have **some** notice of the character of the books he sells: must have **some** knowledge of the contents of the book or books alleged to be obscene. While the United States Supreme Court fails to specify in detail exactly and definitely what the court comprehends by its use of the word "knowledge," it seems to disapprove of convictions under anti-obscenity laws unless there is some reasonable proof that the bookseller had some "notice of the character of the books" for sale. All that the United States Supreme Court is requiring in such prosecution is that the prosecuting authority prove that the bookseller had a general knowledge of the general, ordinary, and usual contents of the books in his store. We do not believe that the United States Supreme Court ever intended to establish a rule of law allowing a bookseller with impunity to shut his eyes to something which he could readily see, nor shut his mind to something which he should and easily could know, for then, as Judge Benjamin Gassman of the Court of Special Sessions of the City of New York pointed out in a decision in January, 1960, the claimed lack of knowledge on the part of the bookseller is sham and should not be permitted to defeat the purpose of a statute or ordinance which seeks to outlaw traffic in obscene literature.

If a book seller is proven to have general knowledge of the contents of the publications which he stocks it seems to us to be no valid defense that he did not think the contents obscene if a jury, after being provided with a proper definition of legal obscenity by the judge, finds they are obscene. If a bookseller, such as the defendant in this case, with full knowledge and willfulness is engaged in the business of selling indecent magazines and photographs, he voluntarily runs the risk of having such declared to be legally obscene.

The United States Supreme Court itself has this to say concerning a bookseller's disclaimer of the knowledge of their books' contents:

"Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial."

We would point out that one of the most significant of these "circumstances" to which the Supreme Court refers would be the display for sale of a cheaply produced paper covered book for five, six, or seven, or more dollars. Can it be truthfully said that the bookseller did not know that the sale was induced by the sexual muck which it contained?

The covers, titles and names of many books suggest to the beholder the general nature of their contents. It is admitted that many do not. While preparing this opinion we looked at a row of books in our home library: Peace of Mind, Latin America, Roget's Thesaurus, Home Hygiene and Care of the Sick, Diet and Health, The World Almanac, Thomas Jefferson, Lawyer Lincoln, The Garden Dictionary. A bookseller knows immediately that such as these contain no obscenity. So, also, does the bookseller know from the lurid covers and suggestive titles of other

magazines and publications—unless he attempts to stick his head in the sand with the ostrich—that they probably contain material which deals with sex in a manner appealing to prurient interest. If a bookseller freely chooses to traffic in what obviously is lewd and obscene it is only a requirement of common sense to hold him responsible.

It seems utterly unreasonable and completely unrealistic to hold a book store proprietor responsible for such obligations as taxes on his property and merchandise, the payment of his utility bills, safety and sanitary measures in his store, federal withholding taxes, and all the other reasonable and necessary requirements to the legal and successful operation of his establishment, but allow him in an anti-obscenity prosecution to disclaim general knowledge of what he has for sale. Does not an automobile dealer know whether or not he has Corvairs or Cadillacs on his showroom floor? Does not a grocery owner know generally what vegetables he displays for sale? Does not the proprietor of a men's store know generally whether or not he has brown or green ties for sale, even though he might not be able to describe each one in detail? The answers obviously must be yes. We do not think the language of the United States Supreme Court in the Smith case is intended to allow booksellers to be ostriches with their heads buried in the sand. Furthermore, we are of the opinion that if and when the U. S. Supreme Court has before it for determination the extent of knowledge and notice required for a bookseller, it will decide that a bookseller cannot with impunity look the other way and deny any knowledge of his merchandise. We also believe that the scienter, made an indispensable factor by the Smith case, can be minimal, that is, only what is reasonable under the circumstances. It would not surprise us to find the highest court of the land sustaining a law or ordinance which made mere possession of books and especially magazines by booksellers prima facie proof of knowledge of their general and usual content, a presumption which could be rebutted if justified.

We find here that the defendant King had not only general but specific knowledge of the obscene content of the books and magazines in this case. Both the testimony of Lieut. Lind of the Cincinnati Police Department and that of George Pots, an employee of the defendant, prove this.

Here is some of the testimony of Mr. Pots, who was called originally as the defendant's witness:

— D I R E C T —

"Q. Where was this book at the time of the police raid in December, 1958?

"A. It was in the basement tied in a bundle.

"Q. Why was this in the basement tied in bundles?

"A. Well, it was questionable and it was being held in abeyance for the outcome of the other case.

"Q. At the time of the police raid in December 1958, was there pending before the courts an appeal on a previous arrest of Mr. King?

"A. Yes there was an appeal pending.

— CROSS EXAMINATION —

"Q. There was an appeal pending and the trial court—I want to

rephrase that. The appeal that was pending at that time. Let me withdraw that and rephrase my question again. Isn't it a fact, sir, that the trial court was affirmed in its finding by the Appellate Court with reference to this case that you said was pending?

"A. Well, I have to go on hearsay. I'm not connected with the case in the courts.

"Q. That's what you testified to before. It was hearsay then: is that right?

"A. Well, certainly.

"Q. I will accept your hearsay then on cross. Was it, sir?

"A. It was.

"Q. The trial court was affirmed. As a matter of fact, the trial court was affirmed in each instance at all appellate levels? ·

"A. I don't quite understand the question at all.

"Q. The conviction in the original case was never overruled, so far as you know, was it, sir?

"A. Never overruled, no.

. . · . . . .

"Q. How many copies were there, sir, do you know that?

"A. No, I don't. They were never counted. They were bundled up and put downstairs.

"Q. Would you know, sir, if there were about thirty-six copies?

"A. Well, I couldn't tell you exactly, no.

"Q. Would that be approximately correct?

"A. Well, there was a bundle so high (indicating) which would be in that neighborhood.

"Q. Is there a publication known as 'Cabaret' as well as 'Cabaret Yearbook'?

"A. Yes, sir, there is.

"Q. Did you have 'Cabaret' for sale and on display? ⸱

"A. I don't recall.

"Q. Can you tell me whether or not thirty-six issues of the publication which is described in this receipt as 'Cabaret' were taken from the front of the store under the counter or not?

"A. I couldn't tell you.

"Q. You don't know. How is it you are so sure this was in the basement then, sir?

"A. Well, I bundled them up and put them down myself.

"Q. You bundled them up?

"A. That's right.

"Q. Why did you do this?

"A. Because Mr. King instructed me to take them off the stand.

"Q. When did he instruct you, sir?

"A. Just after it became involved.

"Q. After what?

"A. After it became questionable.

"Q. Why did it become questionable?

"A. I don't know.

"Q. Are you sure you don't know, sir?

"A. I'm positive I don't know.

"Q. Do you know is this 'Cabaret Yearbook' was the subject of other litigation involving Mr. King?

"A. It was supposed to be. That's why I was instructed to take it off the stands.

"Q. That's what Mr. King told you?

"A. Certainly.

"Q. Didn't Mr. King tell you, sir, that this was the conviction that was pending appeal that you previously spoke about, and that 'Cabaret Yearbook' was one of those books involved in that conviction? Isn't that what he told you?

"A. I didn't question him. When he told me to take the Yearbooks off, that they were questionable, I took them off.

"Q. But you didn't destroy them?

"A. Well, I wasn't told to destroy them.

"Q. Mr. King didn't tell you to destroy them or get rid of them?

"A. Well, they were laying downstairs bundled up and they weren't for sale.

"Q. They weren't for sale but you had possession of them, didn't you?

"A. They were in the store."

The United States Supreme Court holds that proof of knowledge on the part of the bookseller is an absolute requirement. As we have indicated, the evidence in this case clearly establishes, without a question of a doubt, that defendant King was aware of the contents of the books and magazines which he had in his store for sale and which form the basis for the city's prosecution in this case, and which were admitted into evidence as exhibits.

The trial court did not include in its instructions to the jury a charge on the necessity of proving knowledge. But if this was error in any respect, which is doubtful under the circumstances, it was waived when defendant's counsel did not bring the omission to the attention of the court. Where a general charge is not as complete as it might have been, the error, if any, is one of omission and not commission, and counsel cannot sit idly by and then later complain about the claimed omission.

Under the state of facts present in the trial of this King case, the operation of Cincinnati's "Indecedent Publications" ordinance is completely constitutional.

We are not overlooking the City of Cleveland v. Betts, decided by the Ohio Supreme Court on December 31, 1958, 168 Oh St 386, and which stands for the legal proposition that a municipal ordinance cannot make a certain course of conduct a misdemeanor if a general statutory enactment makes the identical offense a felony.

We do not consider that the Betts case has direct applicability in our determination of the two motions. However, it is conceivable that the doctrine which Betts expounds might be argued in support of the proposition that the defendant in this case cannot be convicted of a misdemeanor under a Cincinnati ordinance when proof of the same elements constitutes commission of a felony under Ohio's general obscenity statute, §2905.34 R. C. This presents nothing fatal to the sound-

ness and validity of the conviction in this case because we regard §2905.34 R. C., as construed with §3767.01 R. C.—and they must be interpreted together—as not constitutional so far as newspapers, magazines or other publications are concerned. There cannot be a conflict of legal consequence between an existing ordinance and an invalid statute. Nothing can come in conflict with a nullity.

The last sentence of §3767.01 R. C., reads:

"This section and §§2905.34 . . . R. C., shall not affect any motion picture film which has been approved by the division of film censorship or any newspaper, magazine, or other publication entered as second class matter by the post office department."

We find no case decided by the Supreme Court of Ohio in which these kindred sections (§§2905.34 and 3767.01 R. C.), are held constitutional. Contrariwise, on March 23 of this year, in State v. Mapp, five of the judges of the Supreme Court of Ohio expressed their opinion that §2905.34 R. C., is constitutionally invalid for the reason that

"if anyone looks at a book and finds it lewd, he is forthwith, under this legislation, guilty of a serious crime, which may involve a sentence to the penitentiary similar to the one given to this defendant. As a result, some who might otherwise read books that are not obscene may well be discouraged from doing so and their free circulation and use will be impeded."

Our reasons for viewing §2905.34 R. C., as invalid are different. We believe that as a result of the clause in §3767.01 R. C., by which a modification is introduced into §2905.34 R. C., there is an improper and illegal delegation of power to administrative officials, and also that the section is illegally and unreasonably discriminatory in favoring holders of second class postal permits. We say it is unreasonable because a second class permit does not guarantee that the contents of a publication are not obscene. It simply certifies that at the time of the granting of the second class permit the publication met certain legal requirements, including those respecting obscenity, but the grant of a second-class entry does not guarantee that subsequent to the issuance of the permit the content will not be changed to obscene stories, photographs, drawings and the like. Sec. 2905.34 R. C., is arbitrary in that it discriminates against all in favor of a special protected class of postal permit holders who have immunity from criminal prosecution even though the content of their publication is obscene. The classification attempted here is arbitrary because it is based upon no real or substantial differences reasonably related to the subject of the legislation.

We do not consider that §3767.01 R. C., can be stricken down to save §2905.34 R. C., because to do so would amount to judicial legislation by attempting to include a class of persons—second class postal permit holders—within the purview of §2905.34 R. C., although the legislative will contemporaneously expressed was to the contrary. We say contemporaneously expressed since the effective date of both of these sections was the same. (Sec. 2905.34 R. C., was changed two years later but only to the extent of altering the penalty provision.)

We think it is appropriate and interesting to note that at the 1959

session of the Ohio Legislature, both the House and Senate unanimously approved a bill removing the last sentence from §3767.01 R. C. However, it did not become law.

"It is not the function of a court to set forth what it thinks the statute under consideration should provide, or to give to a statute an operation which the legislature does not intend. . . . In other words, the statute may not be restrained, constrained, restricted, qualified, narrowed, abridged or distorted. The statute may not be rewritten. Nothing may be read into, or out of, the statute which is not within the manifest intention of the legislature as gathered from the act itself." 37 **O. Jur. par.** 269, under "Statutes."

The United States Supreme Court has stated in Frost v. Corporation Commission, 278 U. S. 515:

"Where the excepting proviso is found unconstitutional the substantive provisions which it qualifies cannot stand."

See also recent decision of the Ohio Supreme Court reported in **166 Oh St 116,** decided January 30, 1957, and Davis v. Wallace, 257 U. S. 478.

Defendant received a fair trial free from any prejudicial error. Defendant's motions are denied and the attorneys may present an entry consistent with this opinion. The Court will proceed to sentencing pursuant to the verdict of the jury.